UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TIG INSURANCE COMPANY (f/k/a Transamerica Insurance Company),<br><br>Plaintiff,<br><br>-vs-<br><br>MISSIONARY OBLATES OF MARY IMMACULATE (f/k/a The Reverend Oblate Fathers),<br><br>Defendant. | Civil No. _____<br><br>Demand for Jury Trial |

**COMPLAINT FOR DECLARATORY RELIEF**

For its complaint against defendant Missionary Oblates of Mary Immaculate, formerly known as The Reverend Oblate Fathers (the "Oblates"), plaintiff TIG Insurance Company, formerly known as Transamerica Insurance Company ("TIG"), alleges as follows:

**I.   INTRODUCTION**

1.  This is an action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a determination of the respective rights and obligations of TIG and the Oblates under certain primary and umbrella insurance policies issued by TIG to the Oblates.

2.  The Oblates seek coverage under policies issued by TIG for a series of claims arising out of underlying lawsuits filed against the Oblates by individuals alleging sexual abuse by the Oblates' priests or brothers.

3.  In this action, TIG seeks a determination of coverage between it and the Oblates in connection with the underlying lawsuits filed against the Oblates by individuals alleging sexual abuse, and any additional sexual abuse claims pending against the Oblates or that may be brought

- 1 -

against the Oblates (the "Sexual Abuse Claims"). As set forth below, the issues to be decided in this action, include, without limitation, the following:

(a) Whether the Oblates can establish the material terms, conditions, and other provisions of each TIG primary and umbrella policy under which the Oblates seek indemnity or defense for the Sexual Abuse Claims;

(b) Whether TIG has any obligation under its policies to provide insurance coverage to, or a duty to defend and/or indemnify, the Oblates for claims arising out of alleged sexual abuse by Father James Vincent Fitzgerald, including, *inter alia*, whether the Oblates can establish that such claims involve an "occurrence" as defined by the policies;

(c) Whether other terms, conditions, exclusions, or other provisions in the policies preclude or limit coverage to the Oblates for the Sexual Abuse Claims; and

(d) Whether the Oblates are seeking coverage for amounts already paid by the Oblates or that may be paid in the future by the Oblates for resolution of Sexual Abuse Claims that are uninsurable or for which insurance is precluded by public policy.

## II.   PARTIES

4. Plaintiff TIG Insurance Company, formerly known as Transamerica Insurance Company, is a California corporation with its principal place of business in New Hampshire.

5. Upon information and belief, defendant Missionary Oblates of Mary Immaculate, formerly known as The Reverend Oblate Fathers, is an Illinois corporation with its principal place of business in Illinois. Upon information and belief, defendant is registered to do business in Minnesota as a foreign corporation with a registered office address at 104 N. Mississippi River Blvd, St. Paul, Minnesota. For decades, the Oblates have conducted operations in Minnesota,

including through placing priests and brothers in ministry positions throughout the state of Minnesota.

## III. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between TIG and the Oblates and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue in this Court is proper under 28 U.S.C. § 1391 because the Oblates reside in Minnesota, is subject to personal jurisdiction in in this judicial district with respect to this civil action, and a substantial part of the events or omissions giving rise to the claims asserted in this complaint, including the Oblates' purchase of insurance policies from TIG, occurred in this judicial district.

## IV. BACKGROUND FACTS

### A. The TIG Policies

8. The Oblates (then known as The Reverend Oblate Fathers) assert that it is a named insured under two primary and three umbrella insurance policies (collectively, the "TIG Policies") issued by TIG (formerly known as Transamerica Insurance Company). The table below sets forth the assertions made by the Oblates regarding the TIG Policies, which TIG reserves the right to dispute in whole or in part:

| POLICY NUMBER | POLICY PERIOD | LIMITS/ ATTACHMENT POINT |
| --- | --- | --- |
| 6820357 | 6/1/1973 to 6/1/1976 | $300,000 |
| 8695711 | 6/1/1976 to 6/1/1979 | $300,000 |
| U-3507459 | [6/1/1973 to 6/1/1976] | $5,000,000 over $300,000 |

| POLICY NUMBER | POLICY PERIOD | LIMITS/ ATTACHMENT POINT |
|---|---|---|
| U-3579134 | 6/1/1976 to 6/1/1977 | $5,000,000 over $300,000 |
| U-3589025 | 6/1/1977 to 6/1/1978 | $5,000,000 over $300,000 |

9. TIG has not located a complete copy of any of the TIG Policies, and has been unable to locate any policy documents with respect to certain of the TIG Policies.

10. TIG has located documents that appear to represent incomplete portions of primary policy 682-03-57.  These documents list the Oblates' address as 104 Mississippi River Boulevard, St. Paul, Minnesota.

11. TIG has located documents that appear to represent incomplete portions of umbrella policies U-357-9134 and U-358-9025.  Those documents are limited and do not set forth the material terms of those policies.

12. TIG has been unable to locate any policy documents related to primary policy 869-57-11 or umbrella policy U-350-7459, including any documents showing the material terms of those policies.

13. TIG requested that the Oblates provide the portions of the TIG Policies in their possession or to which they had access.  To date, the Oblates have not provided copies of any portions of the TIG Policies, nor have they provided other information or documentation sufficient to establish the material terms of all of the TIG Policies.

14. In part, Policy 682-03-57 states as follows:

**COVERAGE A – BODILY INJURY – except Automobile**

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence.  The company shall

have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.  The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

15. Policy 682-03-57 defines "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

16. Policy 682-03-57 defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

**B.    The Oblates and Sexual Abuse Claims against the Oblates**

17. Upon information and belief, the Oblates is a missionary religious congregation of the Catholic Church founded in 1816 by St. Eugene De Mazenod which describes itself as an organization that serves people in the United States and more than 60 countries around the world.

18. Upon information and belief, when the Oblates ordain an individual as an Oblates priest, that individual takes a vow of obedience to the Oblates and its highest-ranking official, known as the "Provincial."  Upon information and belief, from that point, Oblates priests remain under the authority and supervision of the Oblates' Provincial.

19. Upon information and belief, if a diocese of the Catholic Church needs a priest to serve within its boundaries, it can make a request to the Oblates' Provincial, who then selects a priest for the assignment, subject to approval by the requesting diocese's Bishop.

20. Upon information and belief, once an Oblates priest is granted "faculties" (permission to minister) within a particular diocese, the priest is the employee of both the Oblates and the diocese.  Upon information and belief, the Oblates' Provincial continues to supervise the

priest, including retaining the right to remove or reassign him, place restrictions on his ministry, and require that he undergo specified training or comply with policies.

21. The Oblates have been sued in numerous lawsuits alleging that a priest or brother under the Oblates' supervision sexually abused individuals when they were minors.

**C.   The Oblates' knowledge of sexual abuse allegations against Father James Vincent Fitzgerald**

22. Many of the Sexual Abuse Claims involve allegations against Father James Vincent Fitzgerald, who, upon information and belief, took perpetual vows in 1948 and was ordained by the Oblates in 1950. Upon information and belief, until his death in 2009, Father Fitzgerald remained under the authority and supervision of the Oblates and its Provincial.

23. Upon information and belief, the Oblates became aware of Father Fitzgerald's alleged sexual abuse of minors no later than 1963, when the Oblates learned that he had allegedly abused a minor girl in a swimming pool. Upon information and belief, after this incident the Oblates sent Father Fitzgerald to a psychiatrist and also quickly reassigned him to Orr, Minnesota, within the Diocese of Duluth.

24. According to allegations in a 2010 civil lawsuit (*M.W.D., et al. v. The Catholic Diocese of Sioux Falls, et al.* Circuit Court, Second Judicial District, State of South Dakota, County of Minnehaha), in approximately 1968, and while assigned to the Diocese of Sioux Falls, in South Dakota, Father Fitzgerald allegedly sexually abused at least one minor female and one minor male who were boarders/residents at the Tekakwitha Orphanage located within the Tekakwitha Indian Mission in Sisseston, South Dakota. Upon information and belief, the Oblates' Provincial became aware of Father Fitzgerald's alleged abuse of these minors and responded by assigning him to a new position within the Diocese of Duluth.

25. Upon information and belief, from approximately 1968 to 1979, Father Fitzgerald

worked at St. Catherine's Church in Squaw Lake, Minnesota, within the Diocese of Duluth.

26. According to a 2014 civil lawsuit (*Doe 30 v. Diocese of New Ulm, et al.*, No. 62-cv-14-871 (Minn. Dist. Ct., Ramsey County)), in approximately 1978, Father Fitzgerald sexually abused an altar boy (designated as Doe 30). Upon information and belief, Father Fitzgerald also allegedly sexually abused Doe 30's brother (designated as Doe 155) in 1978. Upon information and belief, the brothers' family reported the abuse at the time and at least one Oblates priest was also advised at the time.

27. According to a summary judgment order issued in the *Doe 30* lawsuit, the Oblates' file on Father Fitzgerald "contains documentation that he abused both minor boys and girls prior to his abuse of [Doe 30 in 1978] and that [the Oblates were] aware of the abuse at the time." This order further found that "[a]s a result, Fitzgerald was reassigned by the [Oblates] on more than one occasion" and "was sent to a psychiatrist after [the] incident in 1963."

28. Upon information and belief, despite the foregoing, the Oblates continued to recommend Father Fitzgerald for assignments involving direct contact with minors.

29. Upon information and belief, in addition to knowledge about multiple incidents of alleged sexual abuse involving Father Fitzgerald, the problem of priests engaging in sexual abuse of minors was well-known by the Catholic Church and its Bishops before 1979.

**D.    The Oblates' notice of the Sexual Abuse Claims to TIG and TIG's response**

30. The Oblates have provided notice to TIG of approximately 21 claims involving alleged sexual abuse of minors during the 1973-1979 alleged policy periods of the TIG Policies. Approximately 15 of the Sexual Abuse Claims filed against the Oblates allege abuse while the priest or brother was affiliated with a Minnesota diocese or parish.

31. Upon information and belief, these Minnesota claims were brought pursuant to

the Minnesota Child Victims Act, Minn. Stat. § 541.073 (the "CVA"). In 2013, the State of Minnesota enacted the CVA, which opened a three-year window (which expired May 25, 2016) for victims of child sexual abuse to assert otherwise time-barred claims. The CVA did not, however, revive claims based on allegations of vicarious liability or *respondeat superior*. Upon information and belief, the Oblates have entered into stipulations relating to the Minnesota lawsuits extending the deadline for filing an action after commencement of a lawsuit.

32. To date, the Oblates have tendered nine Sexual Abuse Claims to TIG involving Father Fitzgerald: Doe 85 (alleging abuse in 1969-1974); Doe 86 (alleging abuse in 1978-1981); Doe 117 (alleging abuse in 1971-1976); Doe 121 (alleging abuse from 1978-1982); Doe 155 (alleging abuse in 1978); Doe 329 (alleging abuse in 1976-1980); Doe 330 (alleging abuse in 1978-1981); Doe 371 (alleging abuse from 1976-1982); and Doe 419 (alleging abuse in 1976) (the "Father Fitzgerald Claims").

33. The Father Fitzgerald Claims allege, in part, that the Oblates:

(a) placed Father Fitzgerald in positions where he had access to and worked with children as an integral part of his work;

(b) knew or should have known Father Fitzgerald was not fit to work with children and was a danger to children;

(c) knew or should have known of the 1968 sexual abuse incidents at the Tekakwitha Orphanage;

(d) failed to warn the victims and their families of the risk Father Fitzgerald posed, the risk of child sexual abuse by clerics generally, or about any knowledge they had about child sex abuse;

(e) violated a legal duty by failing to report known and/or suspected abuse of

children by Father Fitzgerald to police or law enforcement;

(f) knew or should have known there was a risk of child sex abuse for children participating in Catholic programs and activities;

(g) knew or should have known that many of the Oblates' agents had sexually molested children, that child molesters have a high rate of repeating their sexually abusive behavior multiple times, and that there was a specific danger of child sex abuse for children participating in their youth programs; and

(h) became aware or should have become aware of problems indicating Father Fitzgerald was an unfit agent with dangerous and exploitive propensities, but failed to take any action to remedy the problem or investigate or remove him from working with children.

34. The Father Fitzgerald Claims also allege that he posed a danger to those he encountered on Oblates' property.

35. TIG agreed to defend the Oblates against certain Sexual Abuse Claims under primary policies 682-03-57 and 869-57-11 as stated in January 14, 2019 and April 22, 2019 letters to counsel for the Oblates. TIG reserved its rights under Policy 869-57-11 due to insufficient policy information located and/or provided to TIG, and reserved rights under both policies to, *inter alia*, withdraw from the defense of the Sexual Abuse Claims, file an action for declaratory relief to determine its rights and duties under the TIG Policies, and seek recovery of defense costs incurred in the defense of the Oblates in the event it is determined that no defense is owed.

36. TIG disclaimed any current obligation to defend the Oblates under umbrella policies U-350-7459, U-357-9134, or U-358-9025 due to lack of evidence of exhaustion of

underlying insurance and insufficient policy information located and/or provided to TIG.

37.     TIG fully reserved its rights under all of the TIG Policies, including the right to deny coverage or assert any applicable right or defense under the policies, law, or equity.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Declaratory Judgment – Defendant's Failure to Prove the Terms of
Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025)

38.     TIG incorporates by reference the allegations set forth in paragraphs 1 through 37 of this Complaint.

39.     An actual or existing controversy exists between TIG, on the one hand, and the Oblates, on the other hand, concerning the terms, conditions, or other provisions of Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025.

40.     The Oblates have sought coverage for one or more Sexual Abuse Claims from TIG under each of these policies.

41.     TIG contends that the Oblates have not proven and/or will not be able to prove all of the material terms, conditions, or other provisions of Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025, or any of them.

42.     On information and belief, the Oblates dispute or may dispute the foregoing contentions by TIG.

43.     Pursuant to 28 U.S.C. § 2201, TIG requests that the Court enter a declaration that TIG is not obligated to provide insurance coverage to, and has no duty to defend and/or indemnify, the Oblates for any of the Sexual Abuse Claims under Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025 because of the Oblates' failure to prove the material terms, conditions, or other provisions of those policies.

**SECOND CLAIM FOR RELIEF**
(Declaratory Judgment – No Coverage for Claims involving Father Fitzgerald)

44. TIG incorporates by reference the allegations set forth in paragraphs 1 through 43 of this Complaint.

45. TIG has no obligation to provide insurance coverage for the Sexual Abuse Claims under Policy 682-03-57 unless the Oblates establish, among other things, "bodily injury" "which occurs during the policy period" "to which this insurance applies, caused by an occurrence."

46. Policy 682-03-57 defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

47. The Father Fitzgerald Claims allege that Father Fitzgerald posed a danger, and the Oblates knew or should have known (or were aware or should have become aware) that Father Fitzgerald was not fit to work with and was a danger to children, had dangerous and exploitive propensities, and previously sexually abused multiple children. The Father Fitzgerald Claims also allege that child molesters have a high rate of repeating their sexually abusive behavior multiple times, and that there was a specific danger of child sex abuse for children participating in the Oblates' youth programs.

48. The Father Fitzgerald Claims further allege the Oblates, among other things: placed Father Fitzgerald in positions where he had access to and worked with children as an integral part of his work; failed to warn the victims and their families of the risk he posed or the risk of child sexual abuse by clerics generally; failed to take any action to remedy the problem or investigate or remove him from working with children; and violated a legal duty by failing to report known and/or suspected abuse of children by Father Fitzgerald and/or other agents to police or law enforcement.

49. As set forth above, upon information and belief, the Oblates had knowledge regarding the sexual abuse of minors perpetrated by Father Fitzgerald as early as 1963, including at least 5 victims involved in the 1963, 1968, and 1978 sexual abuse incidents. Upon information and belief, despite that knowledge, on more than one occasion the Oblates simply reassigned Father Fitzgerald after learning of a sexual abuse incident, and continued to allow him to interact with young children, ultimately resulting in their sexual abuse.

50. The Oblates are unable to establish that the alleged bodily injury caused by Father Fitzgerald's sexual abuse of minors during the policy period of Policy 682-03-57 resulted from an "accident" or was "neither expected nor intended from the standpoint of" the Oblates.

51. TIG has no obligation to provide insurance coverage to the Oblates, including any duty to defend and/or indemnify, under the terms of Policy 682-03-57 for any Sexual Abuse Claim where the Oblates knew, prior to the claimant's alleged sexual abuse, that a priest had engaged in earlier sexual abuse and therefore expectably presented a danger to children.

52. TIG has no obligation to provide insurance coverage to the Oblates, including any duty to defend and/or indemnify, under the terms of Policy 682-03-57 for any Sexual Abuse Claim where the Oblates knew or expected that there was a risk that children interacting with the Oblates' priests were in danger of sexual abuse.

53. The Oblates are, therefore, not entitled to insurance coverage, including not being entitled to a defense or indemnity, under Policy 682-03-57 for any Sexual Abuse Claims involving Father Fitzgerald that do not set forth an "occurrence."

54. TIG contends that it is not obligated to provide insurance coverage to, and has no duty to defend and/or indemnify, the Oblates for any of the Sexual Abuse Claims, including those involving Father Fitzgerald, under Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-

9025 because of the Oblates' failure to prove the material terms, conditions, or other provisions of those policies. If the Oblates are able to prove the material terms, conditions, or other provisions of those policies, and those terms, conditions, or other provisions are materially the same as those of Policy 682-03-57, the foregoing contentions would also apply to Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025.

55. On information and belief, the Oblates dispute or may dispute the foregoing contentions by TIG.

56. Pursuant to 28 U.S.C. § 2201, TIG requests the Court enter a declaration that TIG is not obligated to provide insurance coverage to, and has no duty to defend and/or indemnify, the Oblates under Policy No. 682-03-57 (and Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025 to the extent the Oblates are able to prove the terms, conditions, or other provisions of those policies are materially the same) for any Sexual Abuse Claims involving Father Fitzgerald that do not set forth an "occurrence."

**THIRD CLAIM FOR RELIEF**
(Declaratory Judgment – Other Terms, Conditions,
Exclusions, or Provisions of the TIG Policies)

57. TIG incorporates by reference the allegations set forth in paragraphs 1 through 56 of this Complaint.

58. An actual or existing controversy exists between TIG, on the one hand, and the Oblates, on the other hand, concerning their respective rights and obligations with respect to whether and to what extent TIG has any obligation to defend and/or indemnify the Oblates against the Sexual Abuse Claims based on the terms, conditions, exclusions or other provisions of the TIG Policies, in addition to the issues raised in the First and Second Claims for Relief.

59. Pursuant to 28 U.S.C. § 2201, TIG requests that the Court enter a declaration

determining the respective rights and obligations of TIG and the Oblates under the TIG Policies concerning defense and indemnity of the Oblates for existing and future Sexual Abuse Claims. Such disputes include, but are not limited to, whether and to what extent TIG has any obligation to defend and/or indemnify the Oblates against the Sexual Abuse Claims or to reimburse the Oblates for any defense or indemnity costs respecting the Sexual Abuse Claims under the TIG Policies because, among other things:

    (a) there was or may have been no "bodily injury" within the meaning of some or all of the TIG Policies for some or all of the underlying claims, including, but not limited to, no bodily injury during the policy period;

    (b) there was or may have been no "occurrence" or "accident" within the meaning of some or all of the TIG Policies with respect to some or all of the underlying claims;

    (c) some or all of the alleged bodily injury was or may have been expected or intended from the standpoint of the Oblates;

    (d) if any coverage were available under any of the TIG Policies, such coverage would, in any event, be subject to the limitations on coverage under those policies.  For instance, any coverage would be limited by "per occurrence" and/or "aggregate" limits of liability and/or non-cumulation of liability and prior or other insurance provisions, and no stacking of policies would be permissible.  No coverage would be available under any of the umbrella policies until and unless all applicable coverage underlying those umbrella policies had been properly exhausted.  Similarly, any applicable deductible amounts or self-insured retentions would first have to be met before any

coverage could be available. Moreover, any coverage otherwise available would be reduced or eliminated to the extent that the limits were otherwise impaired or exhausted by prior claims or underlying policies were not maintained in full force or effect;

(e) there is no coverage for losses that are outside the coverage afforded by the TIG Policies and/or which are uninsurable and for which insurance is precluded by public policy;

(f) there is no coverage for any underlying claims that are time-barred by the applicable statute of limitations and/or the doctrine of laches;

(g) any underlying claims brought pursuant to the Minnesota CVA must be premised on direct liability by the Oblates, and not vicarious liability or *respondeat superior*, and, thus, there is or may be no coverage for some or all of these claims;

(h) there is no coverage for any named defendant that does not meet the definition of an insured under the policies;

(i) there is no coverage for any lawsuit commenced in a court or jurisdiction outside the "policy territory" within the meaning of some or all of the TIG Policies;

(j) there is or may be no coverage to the extent the Oblates did not comply with any notice obligations in some or all of the TIG Policies;

(k) there is no coverage to the extent any other terms, conditions, exclusions or other provisions of the TIG Policies apply to and/or preclude coverage with respect to some or all of the underlying claims;

(l) TIG may have additional coverage issues and defenses that cannot now be articulated, because it does not have all documents and information bearing on the insurance coverage issues raised by this action. Because TIG cannot now assert all of the issues and defenses that it may have to alleged coverage, it expressly reserves the right to reevaluate these issues and defenses and/or to assert additional issues and defenses upon the particularization of the coverage claims asserted and/or upon discovery and review of additional documents and information, and/or upon development of other pertinent facts.

## VI. **PRAYER FOR RELIEF**

WHEREFORE, TIG seeks the following relief:

(a) Under the First Claim for Relief, that the Court issue a declaration that TIG is not obligated to provide insurance coverage to, and has no duty to defend and/or indemnify, the Oblates for any of the Sexual Abuse Claims under Policy Nos. U-350-7459, 869-57-11, U-357-9134, and U-358-9025 because of the Oblates' failure to prove the material terms, conditions, or other provisions of those policies;

(b) Under the Second Claim for Relief, that the Court issue a declaration that TIG is not obligated to provide insurance coverage to, and has no duty to defend and/or indemnify, the Oblates under the TIG Policies, or any of them, for any Sexual Abuse Claims involving Father Fitzgerald that do not set forth an "occurrence;"

(c) Under the Third Claim for Relief, that the Court issue a declaration determining the respective rights and obligations of TIG and the Oblates with respect to whether and to what extent TIG has any obligation to defend and/or indemnify the Oblates against existing or future

Sexual Abuse Claims under the terms, conditions, exclusions, or other provisions of the TIG Policies; and

  (d) Such other and further relief as may be just and proper.

Dated:  October 30, 2020        Respectfully submitted,

                */s/ Charles E. Spevacek*
                Charles E. Spevacek
                MEAGHER + GEER, P.L.L.P.
                33 S. Sixth Street, Suite 4400
                Minneapolis, Minnesota  55402
                (612) 338-0661 (telephone)
                cspevacek@meagher.com

                Mark D. Plevin (*pro hac vice* to be filed)
                Kathryn L. Cervon (*pro hac vice* to be filed)
                CROWELL & MORING LLP
                1001 Pennsylvania Avenue, N.W.
                Washington, D.C.  20004
                (202) 624-2500 (telephone)
                mplevin@crowell.com,
                kcervon@crowell.com

                Kelly H. Tsai (*pro hac vice* to be filed)
                CROWELL & MORING LLP
                590 Madison Avenue, 20th Floor
                New York, New York  10022-2524
                (212) 223-4000 (telephone)
                ktsai@crowell.com

                Attorneys for Plaintiff
                TIG Insurance Company

905851961

**JURY DEMAND**

Plaintiff TIG Insurance Company hereby demands a trial by jury of all issues triable to a jury.

Dated: October 30, 2020　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　*/s/ Charles E. Spevacek*
　　　　　　　　　　　　　　　　　　　　　　Charles E. Spevacek
　　　　　　　　　　　　　　　　　　　　　　MEAGHER + GEER, P.L.L.P.
　　　　　　　　　　　　　　　　　　　　　　33 S. Sixth Street, Suite 4400
　　　　　　　　　　　　　　　　　　　　　　Minneapolis, Minnesota  55402
　　　　　　　　　　　　　　　　　　　　　　(612) 338-0661 (telephone)
　　　　　　　　　　　　　　　　　　　　　　cspevacek@meagher.com

　　　　　　　　　　　　　　　　　　　　　　Mark D. Plevin (*pro hac vice* to be filed)
　　　　　　　　　　　　　　　　　　　　　　Kathryn L. Cervon (*pro hac vice* to be filed)
　　　　　　　　　　　　　　　　　　　　　　CROWELL & MORING LLP
　　　　　　　　　　　　　　　　　　　　　　1001 Pennsylvania Avenue, N.W.
　　　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20004
　　　　　　　　　　　　　　　　　　　　　　(202) 624-2500 (telephone)
　　　　　　　　　　　　　　　　　　　　　　mplevin@crowell.com,
　　　　　　　　　　　　　　　　　　　　　　kcervon@crowell.com

　　　　　　　　　　　　　　　　　　　　　　Kelly H. Tsai (*pro hac vice* to be filed)
　　　　　　　　　　　　　　　　　　　　　　CROWELL & MORING LLP
　　　　　　　　　　　　　　　　　　　　　　590 Madison Avenue, 20th Floor
　　　　　　　　　　　　　　　　　　　　　　New York, New York  10022-2524
　　　　　　　　　　　　　　　　　　　　　　(212) 223-4000 (telephone)
　　　　　　　　　　　　　　　　　　　　　　ktsai@crowell.com

　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　　　　　TIG Insurance Company