UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

TIG Insurance Company, *f/k/a*
*Transamerica Insurance Company*,                    File No. 20-cv-2261 (ECT/JFD)

       Plaintiff and Counter
       Defendant,

v.                                                    **OPINION AND ORDER**

Missionary Oblates of Mary Immaculate,
*f/k/a The Reverend Oblate Fathers*,

       Defendant and Counter
       Claimant,

and

Doe Nos. 86, 121, 155, 329, 330, 371, and
419,

       Counter Defendants and
       Intervenors.

---

Mark D. Plevin, Crowell & Moring LLP, San Francisco, CA; Kathryn L. Cervon and Jordan Anthony Hess, Crowell & Moring LLP, Washington, DC; and Charles E. Spevacek, and Michael P. McNamee, Meagher & Geer, Minneapolis, MN, for Plaintiff TIG Insurance Company.

James Richard Murray, James Sumter Carter, Jr., and Dominique Antonuzzi Meyer, Blank Rome LLP, Washington, DC; and Christopher L. Lynch, Barnes & Thornburg LLP, Minneapolis, MN, for Defendant Missionary Oblates of Mary Immaculate.

Timothy W. Burns, Jesse Bair, Brian P. Cawley, and Nathan Mark Kuenzi, Burns Bair LLP, Madison, WI; Jeffrey R. Anderson and Joshua D. Peck, Jeff Anderson & Associates PA, for Counterclaimant-Intervenor Does.

---

This diversity case concerns insurance-coverage disputes arising from claims that a Catholic priest sexually abused children.  The Intervenors—who appear anonymously as numbered "Does"—claim that Father James Vincent Fitzgerald, a priest affiliated with Defendant Missionary Oblates of Mary Immaculate, sexually abused them.  For each Intervenor, the claimed abuse began in the mid-to-late 1970s.

From June 1, 1973, to June 1, 1979, Plaintiff TIG Insurance Company issued several primary and umbrella policies to the Oblates.  The Oblates tendered the Intervenors' claims to TIG.  TIG brought this case to obtain declarations that these policies do not cover Intervenors' claims.  The Intervenors seek recovery from TIG under *Miller-Shugart* settlements with the Oblates.  *See Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982).

TIG has filed three separate summary-judgment motions, each implicating distinct facts and legal issues.  (I) TIG argues that the abuse suffered by Does 86, 121, 329, 330, and 371 were not covered "occurrences" because any reasonable juror would have to find that the Oblates knew of Fitzgerald's abusive behavior—and therefore knew it was highly likely that he would abuse again—before these Intervenors were abused.[1]  This motion will be denied.  The better answer is that the record evidence TIG cites would not foreclose a reasonable juror from finding that the Oblates did not know or have constructive knowledge of the substantial probability that Fitzgerald would sexually abuse children before he allegedly abused these Intervenors.  (II) TIG argues that, as a matter of law, Does 121 and 371 did not suffer a "bodily injury" essential to triggering coverage under the

---

[1]     The claims of Does 155 and 419 were dismissed pursuant to stipulations.  *See* ECF Nos. 131 and 159.

policies.  This motion will be granted.  Minnesota law is clear that "bodily injury" does not include purely mental or emotional-distress injuries.  The record shows beyond dispute that mental or emotional-distress injuries are all Does 121 and 371 claim to have suffered.  (III) TIG argues that the Oblates and Intervenors have failed as a matter of law to show that TIG issued an umbrella policy to the Oblates effective June 1, 1978, to June 1, 1979.  This motion will be denied.  Though this policy has not been found, the law enables an insured to prove a policy's existence through circumstantial evidence.  And on this record, a reasonable juror could find that TIG issued an umbrella policy to the Oblates during this period that largely matched the umbrella policy it issued to the Oblates effective June 1, 1977, to June 1, 1978.

*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

The Parties agree that Minnesota law governs the case, and there is no good reason to second-guess the Parties' agreement on this point.  *See Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute

the choice of Minnesota law, we assume, without deciding, Minnesota law applies[.]"). Minnesota law will therefore be applied to decide the motions.

## I

TIG argues that the abuse and injuries suffered by the remaining Does 86, 121, 329, 330, and 371[2] were not covered "occurrences," as the TIG policies define that term, because any reasonable juror would have to find that the Oblates knew of Fitzgerald's abusive behavior before these Intervenors were abused and therefore expected the harm Fitzgerald later caused through his abuse of these Intervenors.

## A

*The Missionary Oblates of Mary Immaculate.* The Oblates is a missionary religious congregation of the Catholic Church.  Answer [ECF No. 20] ¶ 17.  In the United States, the Oblates organization is divided into geographic provinces, with each province headed by a "Provincial."  ECF No. 120-11 at 6–7.[3]  The Provincial is the religious superior of all Oblates priests in the province, and has the power to appoint, remove, and transfer Oblates priests to and from assignments.  *Id.* at 6; ECF No. 120-12 at 4–5, 14.

---

[2]    There is some uncertainty whether Doe 121 is a subject of the motion.  TIG referenced Doe 121 in its motion.  ECF No. 97.  In its supporting memorandum, however, TIG omits mention of Doe 121, but for two footnote citations.  ECF No. 99 at 4 (identifying "Does 86, 329, 330, and 371" as the subjects of the motion); *see also id.* at 15 n.59 & n.60.  There is no obvious reason why Doe 121 would not be part of the motion.  Doe 121's abuse occurred about the same time as the other remaining Does.  *See* ECF No. 119-14 at 5.  It is assumed therefore that Doe 121 is a subject of the motion.

[3]    Page cites are to CM/ECF pagination appearing in a document's upper right corner, not to a document's original pagination.

*Father Fitzgerald.*  Fitzgerald was an Oblates priest from 1950 until his death in 2009.  ECF No. 120-13 at 2; ECF No. 122-1 at 2–3.  During his time as an Oblates priest, Fitzgerald was assigned to multiple locations throughout the United States.  His assignment history is described in the following chart:

| Start | End | Assignment | Location |
|---|---|---|---|
| 1951 | 1953 | St. Joseph Novitiate | Godfrey, IL |
| 1953 | 1957 | King's House of Retreats | Buffalo, MN |
| 1957 | 1961 | St. Michael's Parish | Northome, MN |
|  |  | Effie Mission | Bigfork, MN |
| 1961 | 1963 | King's House of Retreats | Henry, IL |
| 1963 | 1964 | Holy Cross Parish | Orr, MN |
| 1964 | 1966 | Immaculate Conception Parish | Neff Lake, MN |
| 1966 | 1968 | Tekakwitha Children's Home | Sisseton, SD |
| 1968 | 1969 | St. Michael's Parish | Northome, MN |
| 1969 | 1969 | St. Michael's Community | St. Louis, MO |
| 1969 | 1982 | St. Michael's Parish | Squaw Lake, MN |
| 1982 | 1986 | St. Ann's Parish | Naytahwaush, MN |
| 1986 | 1987 | Sabbatical | Sancta Barbara, CA |
| 1987 | 1988 | St. William Parish | Gainsville, MO |
| 1988 | 1991 | St. Henry's Oblate Residence (retired) | Belleville, IL |
| 1991 | 1992 | St. Patrick Parish | Calipatria, CA |
| 1992 | 2009 | St. Henry's Oblate Residence (retired) | Belleville, IL |

*Id.*  Particular events relevant to TIG's first summary-judgment motion occurred in three of these assignments: (1) Fitzgerald's assignment in Henry, Illinois, from 1961 to 1963; (2) his assignment in Sisseton, South Dakota, from 1966 to 1968; and (3) his assignment in Squaw Lake, Minnesota, from 1969 to 1982.

*The 1963 Henry, Illinois Incident.*  In 1963, while assigned to King's House of Retreats in Henry, Illinois, Fitzgerald "tore the bottom part of a bathing suit of a girl eight or nine years of age."  *Id.*; ECF No. 120-14 at 2.  Following the incident, Fitzgerald was "moved quickly" to a new assignment in Orr, Minnesota.  ECF No. 120-15 at 2.  At the time, the Oblates' Provincial, Father Coovert, wrote to the Bishop of Peoria to explain the move, stating:

> I regret to tell you that Father Fitzgerald has been forced to leave his position as Director of your Retreat House at Henry. He is suffering from physical exhaustion, and the doctor advised me to give him an extended leave of absence.
>
> . . .
>
> When we meet at Henry I can explain the details.

ECF No. 122-2 at 2.  In a letter to Fitzgerald assigning him to Orr, Coovert wrote, "I trust that by now you have had some rest to recover from your breakdown."  ECF No. 122-3 at 2.  Roughly 29 years later, in an October 1992 letter, then-Provincial Reverend James Deegan requested that Fitzgerald be evaluated by St. Michael's Parish and commented that although "[t]here is no written information in [the Oblates'] files in regard to [the 1963] incident," information regarding the incident "was passed on verbally from one Provincial to the next."  ECF No. 120-15 at 2.  At his evaluation in November 1992, Fitzgerald said that tearing the girl's swimsuit bottom "did not expose her to him and that the 'bathing suit was ragged anyway.'"  ECF No. 120-14 at 2.  He also stated that after the incident "[h]e was assured by a psychiatrist that this was done out of curiosity."  *Id.*  According to

Deegan's letter, "the parents agreed at that time to take no action if [] Fitzgerald was moved immediately from that area." ECF No. 120-15 at 2.

*The 1966 or 1967 Sisseton, South Dakota Incident.* In 1966, Fitzgerald was assigned to the Tekakwitha Children's Home in Sisseton, South Dakota. ECF No. 120-13 at 2; ECF No. 122-1 at 2–3. Years later, in connection with his 1992 evaluation, Fitzgerald described an incident that occurred there in 1966 or 1967. ECF No. 120-14 at 2. Father Joseph McNamara, the priest who evaluated Fitzgerald, explained:

> [I]n 1966 or 1967 [Fitzgerald] was asked to take an eleven or twelve-year-old boy on a trip from the children's home in Sisseton, South Dakota. The boy was angry. He held a knife on Vince and threatened to tell others that "I had done wrong to him." Vince consulted an attorney in Bemidji, Minnesota. He asked the attorney for an opinion whether sharing a bed with a boy and also undressing himself in front of the boy to go swimming would be grounds for an accusation of doing something wrong. The lawyer replied in the affirmative. Vince then called Father Figge, the Provincial, to tell him about this.

*Id*. Fitzgerald remained at Tekakwitha Children's Home until his transfer to St. Michael's Parish in Northome, Minnesota, in 1968. ECF No. 122-5 at 2. At the time of Fitzgerald's transfer, Figge wrote to Fitzgerald:

> Please be assured that I am fully aware of the fact that any difficulties and problems you have encountered in Sisseton[] were not of your making. I only wish that circumstances were otherwise, and we would be able to continue having you do the work which you love so well with the boys in the home.

ECF No. 122-5 at 2. Not long after, in 1969, Fitzgerald was sent to St. Michael's Community, "a facility run by the Paraclete Fathers where priests with addiction[] issues and psychosexual problems were sent for treatment." ECF No. 122-10 at 2.

*The 1974 Squaw Lake, Minnesota Allegation.*   In October 1969, Fitzgerald was transferred to Squaw Lake, Minnesota.  ECF No. 120-13 at 3; ECF No. 122-6 at 2.  In a December 1992 letter to Bishop James Keleher, Provincial Deegan indicated that another allegation had been made against Fitzgerald in 1974 while he was at Squaw Lake.  Deegan wrote,

> In 1974, there was another allegation made against Father Fitzgerald in regard to his involvement with a young boy.  As a result, Father Fitzgerald evidently saw another priest for one session of counselling at that time.  In summary, the family's only request and concern was that Father Fitzgerald receive counselling.

ECF No. 122-11 at 2.

*The First Abuse Allegation Brought by an Intervenor.*   Doe 371 alleges that Fitzgerald's abuse of him began in 1975 when Fitzgerald undressed in front of Doe 371 and a group of other boys after he took them swimming.  ECF No. 120-1 at 7–9.

*Doe 30's Abuse and Attempted Suicide.*   Though continuing to minister at Squaw Lake three days per week, Fitzgerald attended a "Clinical Pastoral Education" program from September 1977 to May 1978 at Willmar State Hospital.  ECF No. 122-12 at 2.  While attending this program, Fitzgerald met Doe 30, and his brother, Doe 155.  *Id.*  In June 1978, after Fitzgerald completed the Clinical Pastoral Education program, he invited Doe 30 to Squaw Lake to serve as an altar boy for two weeks.  *Doe 30 v. Diocese of New Ulm*, No. 62-CV-14-871, 2015 WL 9438214, at *4 (Minn. Dist. Ct. Aug. 21, 2015).  Fitzgerald molested Doe 30 on a daily basis while in Squaw Lake.  *Id.*  Months later, in January 1979, Doe 30 attempted suicide.  Father Francis Garvey—who administered the Clinical Pastoral

8

Education program at Willmar State Hospital—was called to the hospital to perform last rites. ECF No. 122-12 at 2. At the hospital, Doe 30's mother reported Fitzgerald's abuse to Garvey, citing it as the reason Doe 30 had attempted suicide. *Id.* Garvey later recounted:

> I immediately contacted Fr. John McManus, OMI, a close friend of mine, and of the same religious community as Fr. Fitzgerald. He contacted their provincial. The provincial called me and said that he had confronted Fr. Fitzgerald and would follow-up on what needed to be done. Some time later the provincial called me to see if there were any other complaints and any other additional information that I could add. I had nothing more to add to the initial complaint.

*Id.*

*The Onset Dates of Fitzgerald's Abuse of the Remaining Intervenors.* Doe 330 alleges that Fitzgerald began abusing him after June 1, 1978. ECF No. 120-3 at 15. Doe 121 alleges that Fitzgerald's abuse began in July 1978. ECF No. 119-14 at 5. Doe 86 alleges that Fitzgerald's abuse began in the summer of 1978. ECF No. 120-2 at 5–6. There is conflicting evidence regarding when Doe 329's alleged abuse began, but it appears to be either 1976 or 1978. *Compare* ECF No. 120-4 at 9–12, 17, *and* ECF No. 120-5 at 2 (Doe 329's school records indicating that Doe 329 moved to Squaw Lake in 1978), *with* ECF No. 59-4 at 3 ("Plaintiff alleges the abuse took place from approximately 1976–1980.").[4]

*Relevant Policy Language.* TIG issued two, three-year primary policies effective June 1, 1973, to June 1, 1979, and at least three excess umbrella policies effective June 1,

---

[4]     Because I conclude that the Oblates' knowledge of Fitzgerald's abuse is trial-worthy, whether Fitzgerald began abusing Doe 329 in 1976 or 1978 is immaterial.

1973, to June 1, 1978. ECF No. 117-1 at 2–5.[5] Each policy provided that TIG "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of an *occurrence*." ECF No. 117-1 at 37 (emphasis added). Each policy, in turn, defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from the standpoint of the insured*." *Id.* at 41 (emphasis added).[6]

## B

The Parties agree that the "neither expected nor intended" language on which TIG relies for this motion amounts to an exclusion under Minnesota law, ECF No. 132 at 15; ECF No. 155 (oral argument); *see generally* ECF Nos. 99, 143, and similar language has been treated as such by the Eighth Circuit applying Minnesota law. *See Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir. 1996). "While the insured bears the initial burden of demonstrating coverage, [TIG] carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). "Insurance contract exclusions are construed narrowly and strictly against the insurer, and, like coverage, in accordance with the expectations of the insured." *Id.* (citations omitted).

---

[5]    Whether TIG issued a fourth umbrella policy extending the coverage period to June 1, 1979, is immaterial to this first motion. This question is the subject of TIG's third summary-judgment motion, analyzed in Part III.

[6]    The quoted policy language comes from the first primary policy. The Parties agree that the second primary policy has the same material terms (other than the policy period and policy limits) as the first primary policy. ECF No. 117-1 at 2–5.

Under Minnesota law, "[f]or the purposes of an exclusionary clause in an insurance policy the word 'expected' denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions." *Diocese of Winona*, 89 F.3d at 1391 (quoting *Auto-Owners Ins. Co. v. Jensen*, 667 F.2d 714, 720 (8th Cir. 1981)).  The Eighth Circuit has explained:

> The difference between "reasonably foreseeable" and "substantial probability" is the degree of expectability.  A result is reasonably foreseeable if there are indications which would lead a reasonably prudent man to know that the particular results could follow from his acts. Substantial probability is more than this.  The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but *the indications also must be sufficient to forewarn him that the results are highly likely to occur.*

*City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1059 n.4 (8th Cir. 1979) (emphasis added).  Put another way, to show that an insured "expected" the injury requires showing that the insured had a "high degree of certainty" that injury would occur. *Bloomington Steel*, 718 N.W.2d at 897.

Framing these rules in this case's facts, the question is whether a reasonably prudent person in the Oblates' position knew or should have known that Fitzgerald's abuse of the Intervenors was substantially probable as a result of the continuing exposure caused by the Oblate's actions—or, more precisely, whether a reasonable juror could only answer that question "yes" on this record.  *See Diocese of Winona*, 89 F.3d at 1391.

The Eighth Circuit faced a similar issue in *Diocese of Winona*.  There, the court assessed whether abuse of a boy (Thomas Mrozka) by a pedophilic priest (Father

Adamson) was "expected" by insureds—the Diocese of Winona and the Archdiocese of St. Paul and Minneapolis—and thus whether there was coverage within the terms of their occurrence-based insurance policies. *Id.* at 1388–90 (assessing language defining an occurrence in one policy as "an accident, including continuous or repeated exposure to conditions, which results in personal injury . . . which is neither expected nor intended from the standpoint of the insured," and in the other as "an accident or a happening or event . . . which unexpectedly and unintentionally results in personal injury"). Adamson served in the Diocese from 1958 to 1975, then in the Archdiocese from 1975 to 1985. *Id.* at 1389. The sexual abuse of Mrozka began in 1979 and continued into 1987. *Id.* at 1396. The Eighth Circuit assessed the Diocese and the Archdiocese separately.

First, the court determined as a matter of law "that Adamson's abuse of Mrozka was expected by the Diocese for purpose of determining whether there was an occurrence under the policies in question," as "[a] reasonably prudent person in the position of the Diocese should have known there was a substantial probability that Adamson would continue to sexually abuse children." *Id.* at 1394. The court grounded this determination in the fact that the Diocese knew of Adamson's repeated sexual abuse of boys over a fifteen-year period. *Id.* The Diocese had been notified of—and Adamson had admitted to—eight separate cases of sexual abuse or attempted abuse before his abuse of Mrozka in 1979. *Id.* at 1393. Moreover, the Diocese transferred Adamson to the Archdiocese "in light of the needs of youthful parishioners to be free from Adamson's 'sexuality problem.'" *Id.* at 1394. As a result, the court found as a matter of law that there was no occurrence within

the meaning of the Diocese's insurance policies, and no insurance coverage was available to the Diocese for damages arising from Adamson's abuse of Mrozka.

The Eighth Circuit next assessed the Archdiocese. The trial court had determined that the Archdiocese was notified when "[t]wo boys notified a priest that Adamson had fondled a young boy in a whirlpool," and when the priest, in turn, notified the Chancellor of the Archdiocese. *Id.* at 1395. This was not, however, the first report the Archdiocese had received regarding Adamson. The Chancellor's meeting memorandum, prepared in November 1980, stated "that Adamson had two 13 or 14 year old boys spend the night in September or October of 1979," that he took "showers with a number of young boys on an afternoon when there was no school," that he "frequently [took] young boys to the YMCA and . . . fewer and fewer want to go," and engaged in "[a] kind of world that centers on young boys and some late night going out and having visitors in." *Id.* And the Archdiocese knew, after corresponding with the Diocese in December 1980, "that Adamson had previously been in treatment for a 'longstanding' and 'reoccurring' problem." *Id.* The Archdiocese thus knew, based on the more recent abuse, that previous treatment by the Diocese had been ineffective. *Id.* Based on these facts, the Eighth Circuit determined as a matter of law that Adamson's abuse of Mrozka was not unexpected by the Archdiocese after December 1980. *Id.* at 1396.

Central to the Eighth Circuit's determinations as to both the Diocese and Archdiocese, the facts regarding Adamson's past abuse were undisputed. *Id.* at 1392. As the court explained: "Here the facts are undisputed. Where the facts upon which liability is claimed or denied under an insurance policy are undisputed and the existence or amount

of liability depends solely upon a construction of the policy, the question presented is one of law." *Id.*

Tracking the analysis in *Diocese of Winona*, TIG identifies five reasons why, it argues, the Oblates knew or should have known that Fitzgerald's sexual abuse of children was highly likely to occur.  TIG argues that by 1975—the earliest an Intervenor claims to have been abused by Fitzgerald—the Oblates knew: (1) that Fitzgerald had torn the bottom of a female child's swimsuit in Illinois in 1963 and had been transferred as a result of the incident; (2) that Fitzgerald had shared a bed with, and undressed himself in front of, a male child in South Dakota in 1966 or 1967 and had been transferred in 1968 as a result of the incident; (3) that an allegation had been made regarding Fitzgerald's "involvement with a young boy" in 1974, and that Fitzgerald had seen another priest for one counseling session as a result; (4) that Fitzgerald had been accused of abusing a boy in the mid-1970s, resulting in an order that he attend Clinical Pastoral Education in 1977; and (5) that Fitzgerald had a long-standing reputation for improper relationships with young people.  ECF No. 99 at 19–20.  TIG argues that the Oblates, despite knowing of these incidents and repeatedly sending Fitzgerald to treatment as a result, did not take steps to limit his access to children until the 1990s.  *Id.* at 25.  TIG's point is straightforward: the Oblates knew Fitzgerald had abused children in the past—to the point of taking steps to address the incidents—and that its knowledge of these circumstances was enough to put the Oblates on notice that it was highly likely that Fitzgerald would abuse again.

The better answer is that, on this record, a reasonable juror could find that the Oblates reasonably did not possess a high degree of certainty that Fitzgerald would abuse

children before he abused the Intervenors.  Some record evidence on which TIG relies is the subject of genuine fact disputes.  Other record evidence is somewhat indefinite.  And the evidence on which TIG relies is materially different in quality and quantity from the evidence the Eighth Circuit addressed in *Diocese of Winona*.

There is a fact dispute regarding whether what TIG describes as the 1974 event occurred in 1974.  To show this event occurred, TIG cites a letter written by Provincial Deegan in October 1992.  ECF No. 99 at 11 (citing ECF No. 122-11).  The Intervenors argue, however, that Provincial Deegan's reference in that latter to an incident occurring in 1974 was erroneous.  ECF No. 132 at 22.  They argue that Provincial Deegan was actually referring to Does 30 and 155.  Provincial Deegan addressed the cited letter to Father William Perri, the Clinical Program Director of St. Michael's, and requested that St. Michael's evaluate Fitzgerald.  ECF No. 120-15 at 2.  Deegan listed known incidents of abuse committed by Fitzgerald.  *Id.*  After describing the 1963 Illinois incident, Deegan wrote:

> In 1974, Father Fitzgerald participated in a clinical pastoral education program at Wilmar State Hospital.  Father Frank Garvey was his supervisor.  I spoke with Father Garvey about a month ago to make sure I had as much accurate information as possible about the alleged incident.  While participating in the CPE program, Father Fitzgerald took two young boys who were brothers from the area on a trip with him to Northern Minnesota.  It is alleged that while he was in Northern Minnesota with them, he sexually abused one of the boys and that the second boy was able to defend himself from his approaches.  When the two young boys [*handwritten in the margin are the names of Does 30 and 155*] returned to the Wilmar area, the one who was abused attempted suicide.  The mother discovered what had happened and reported the incident to Father Garvey.  Father Garvey reported the incident

> to Father John McManus, an Oblate who was serving at St.
> Cloud Hospital.  When Father McManus talked with Father
> Fitzgerald about the incident he indicated that he had visited
> with another Catholic priest who was a chaplain at a state
> hospital and talked over the situation with this priest.  As a
> result of this conversation, Father Fitzgerald felt that
> everything was taken care of and there was no problem.

*Id.*  Deegan mentions no other 1974 incident in his letter.  Further, Father William H.

Woestman, who took over as Provincial in 1975, testified at his 2016 deposition that he

had not heard about any 1974 allegation.  ECF No. 122-4 at 116.  There is no dispute that

Fitzgerald attended the Clinical Pastoral Education program from September 1977 to May

1978.  ECF No. 122-12 at 2.  In other words, a reasonable juror could find that Deegan's

reference to "1974" was erroneous.

There also is a genuine fact dispute regarding the circumstances under which

Fitzgerald attended the Clinical Pastoral Education program from September 1977 to May

1978.  TIG asserts that Fitzgerald was ordered to attend Clinical Pastoral Education

because of a report made by Fathers Deegan and Upson to Provincial Woestman that

Fitzgerald had been accused of abusing a boy.  ECF No. 99 at 20.  TIG's cited exhibits are

not so specific.  TIG cites a 1990 letter from Fitzgerald to Deegan in which Fitzgerald

discusses his sexual abuse allegations:

> According to the tests and interviews I had at the House of
> Affirmation any problems I had was [sic] always associated
> with an extreme work load.  And this is why they gave me such
> a glowing report.  This was the case in 1976.  I think the local
> Superior and his first assistant gave Father Woestman a bad
> report on my Alcoholic Center.  When they came on a Saturday
> morning to tell me I was ordered to take three quartera [sic] of
> Clinical Pastoral Education, I was so busy with doorbell,
> telephone and counselling that I had to keep them waiting for

> three hours; when finally in a sentence they gave me the
> message and left.

ECF No. 122-14 at 2–3.  Though Fitzgerald wrote that he was "ordered" to go to Clinical

Pastoral Education, he did not write that it was due to sexual abuse allegations.  Fitzgerald's

first-quarter evaluation further clarifies that Fitzgerald was ordered to attend the Clinical

Pastoral Education program.  In this evaluation, Father Garvey wrote:

> Even though he had considered CPE training for a number of
> years, Vince really came to CPE under obedience.  He was
> somewhat apprehensive about this in the beginning, but
> certainly put forth effort during the quarter to make the most of
> the situation . . . .
>
> At long last, Vince, you are finally in a quarter of CPE, whether
> you want to be here or whether you are simply doing it out of
> obedience.  Nevertheless, this is something that you have
> desired for a long time and, even though it is somewhat fearful
> for you, I am sure you have found it a very meaningful and
> growthful experience.

ECF No. 122-13 at 6, 9.  According to Woestman, an Oblates priest's vow of obedience

requires that they "will obey a lawful superior" though "[i]t's very rare that a superior will

tell someone to do something under obedience."  ECF No. 122-4 at 56–57.  Still, while the

evaluation provides extensive commentary on Fitzgerald's identified shortcomings—lack

of confidence, lack of self-awareness, lack of self-acceptance, poor attitude towards

authority, inability to identify and express feelings, and reluctance to be assertive when

working with chemically-dependent people—it does not mention sexual abuse.  *See* ECF

No. 122-13 at 5–10.

TIG also relies on the deposition testimony of Woestman, who stated that Deegan

and Upson approached him "sometime between 1975 and 1981" and that he told them to

"take care of this situation."  ECF No. 122-4 at 79, 127–30.  The deposition transcript reads:

> Q: Is it your best estimate, Father Woestman, that after Fathers Upson and Deegan came and had this conversation with you, that it was after that, that Father Fitzgerald was sent to Willmar State Hospital?
>
> A: That I cannot answer.
>
> Q: That was one of the places that you mentioned that –
>
> A: He had been there.
>
> Q: -- priests were sent?
>
> A: We had the document here that he was there.
>
> Q: That was one of the places that – you mentioned another priest that was sent there that was having a problem; is that correct?
>
> A: Yeah.
>
> Q: So that's one of the places that was used when a priest is having a problem?
>
> A: Correct.

*Id.* at 129–30.  Woestman refused to connect the allegations against Fitzgerald with Fitzgerald's attendance at the Clinical Pastoral Education program.  Woestman's past-tense statement that Fitzgerald "had been there" may reasonably be construed to mean that Fitzgerald had already been to the Clinical Pastoral Education program at the time that Upson and Deegan approached Woestman.  Elsewhere in the deposition, Woestman states that after telling Deegan and Upson to take care of the situation, that he "expected them to have [Fitzgerald] go to, which at that time was practice, to therapy."  *Id.* at 78–80.  The

word "therapy" could be understood to refer to the Clinical Pastoral Education program. But Woestman could also be referring to the Doe 30 allegations, as after Doe 30's attempted suicide, Fitzgerald "visited with another Catholic priest who was a chaplain at a state hospital and talked over the situation with this priest." ECF No. 120-15 at 2.[7] If that were the case, Woestman's testimony would not pertain to conduct that led to Fitzgerald's attendance at the program, but rather to conduct that occurred after his attendance at the Clinical Pastoral Education program, and outside the applicable TIG policy period.

The significance of the 1966 or 1967 Sisseton, South Dakota incident is reasonably susceptible to different interpretations. McNamara's evaluation report—written roughly 25 years after the incident—states that a boy "held a knife on" Fitzgerald, who then "asked [an] attorney for an opinion whether sharing a bed with a boy and also undressing himself in front of the boy to go swimming would be grounds for an accusation of doing something wrong." *See* ECF No. 120-14 at 2. After being told that it would, Fitzgerald "then called Father Figge, the Provincial, to tell him about this." *Id.* No record evidence refutes that this event occurred or that Figge was told about it in at least some capacity. Regardless, what precisely occurred and the inferences to be drawn from the incident are not clear from McNamara's report. Further, a reasonable jury could find that Fitzgerald's 1968 transfer from Sisseton to Northome did not result from a sexual abuse incident. Though TIG points to Fitzgerald's transfer a year or two later as evidence of the Oblates' concern over the

---

[7]     If a jury were to find that Deegan's reference to a 1974 event was erroneous, and that he actually was referring to the Doe 30 incident, his letter would then be read to describe Fitzgerald's meeting with the state hospital chaplain in 1979 as a "session of counseling." ECF No. 122-11 at 2.

incident, its record support for this assertion is deposition testimony from a witness, Reverend Rufus Whitley, who lacked direct knowledge of the underlying facts. *See* ECF No. 117-8 at 31.  At the time of the transfer, however, Figge wrote to Fitzgerald:

> Please be assured that I am fully aware of the fact that any difficulties and problems you have encountered in Sisseton[] were not of your making.  I only wish that circumstances were otherwise, and we would be able to continue having you do the work which you love so well with the boys in the home.

ECF No. 122-5 at 2.  Whatever Fitzgerald told Figge about the 1966/1967 incident, it did not result in Figge mentioning it in the letter or assigning fault to Fitzgerald.  It may be reasonably inferred from this letter that Fitzgerald's conduct with the boy a year or two prior did not factor into the decision to transfer him.  Rather, record evidence suggests another possible reason for Fitzgerald's transfer—an interpersonal conflict between Fitzgerald and another priest named Father Pohlen.  ECF No. 122-8 at 2–3 ("I do not know fully [Father Pohlen's] reasons for removing Father Fitzgerald, nor have I any comments to make on this internal matter, except to say that the Sisters will again be at the mercy of Father Pohlen. . . . I was sorry to hear of Father Pohlen's return from Germany inasmuch as I know it is difficult to work with him.").

Notwithstanding its evident severity, the 1963 Henry, Illinois incident does not remove all room for fact disputes regarding the Oblates' knowledge.  The 1992 evaluation report's description of the incident is not specific.  ECF No. 120-14 at 2.  And at the hearing, TIG justifiably acknowledged that this incident alone would not warrant summary judgment.  ECF No. 161 at 9–10.  The same is true with respect to what TIG characterizes as Fitzgerald's "long-standing reputation for improper relationships with young people."

ECF No. 99 at 20.  TIG relies on Deegan's statement in 1990 that "[f]or the past twenty five years there have been concerns voiced by a number of people in various locations concerning' Fitzgerald's 'relationships with young people."  ECF No. 122-16.  Deegan also wrote in a 1992 letter to Bishop Keleher that "over the years, there have been comments and concerns about how 'Fitz relates to young boys.'"  ECF No. 122-11 at 2. These non-specific statements do not alone establish that the Oblates possessed a high degree of certainty that sexual abuse would occur.  *See Bloomington Steel*, 718 N.W.2d at 897.  *Diocese of Winona*'s focus was on concrete allegations that were reported to officials and admitted to by the abuser that were not comparable to generalized statements made decades later regarding the concerns of "a number of people in various locations."  *See* ECF No. 122-16.

To summarize, TIG fairly seeks to compare this case to *Diocese of Winona*, but I conclude there are dispositive differences.   In *Diocese of Winona*, the facts were undisputed, and the record showed that, before Adamson abused Mrozka, "there were eight separate cases of sexual abuse or attempted abuse *reported to the Diocese and admitted to by Adamson*."  89 F.3d at 1392–93 (emphasis added).  These features are not present on this record.  As explained above, there are fact disputes regarding the evidentiary items at the core of this summary-judgment motion.   And the record here does not show a comparable frequency of abuse incidents, Fitzgerald's admission of his conduct, or reports to the Oblates.  Thus, the better answer is that a reasonable jury would not be constrained only to find that the Oblates knew of Fitzgerald's abusive behavior—and therefore knew it was highly likely that he would abuse again—before the Intervenors were abused.

II

TIG argues that Does 121 and 371 did not suffer a "bodily injury" as that term is defined in the policies. ECF No. 102. The TIG policies cover "damages because of bodily injury." ECF No. 117-1 at 37. What constitutes "bodily injury" is the central dispute of this motion. The issue is whether the phrase encompasses purely mental and emotional injuries.

A

*Doe 121.* Doe 121 alleges that he was sexually abused by Fitzgerald on multiple occasions beginning in July 1978. ECF No. 119-14 at 9, 11–13, 29. Doe 121 alleges that Fitzgerald bathed naked in front of him and forced him to do the same. *Id.* at 18. Doe 121 also alleges that while riding as a passenger in Fitzgerald's vehicle, he was forced to place his head on Fitzgerald's lap while Fitzgerald's genitals were exposed. ECF No. 120 at 13. Doe 121 alleges that Fitzgerald forced him to sleep in the same bed as Fitzgerald on multiple occasions, and that Fitzgerald fondled him each time. ECF No. 119-14 at 18. Doe 121 alleges that on one occasion, Fitzgerald hugged Doe 121 from behind in bed and attempted to physically control and penetrate him. *Id.* at 19 ("He tried to – he had me up against him. I was laying in his bed looking outward and he was behind me. And he had me in, like, a bear hug. He didn't want to let me loose."). Doe 121 prevented Fitzgerald from penetrating him. *Id.* Fitzgerald ejaculated on Doe 121's backside. *Id.* Doe 121 testified, however, that he had not been physically injured by Fitzgerald. *Id.*

*Doe 371.* Doe 371 alleges that over the course of two summers, Fitzgerald took Doe 371 and a group of four other boys swimming on four occasions, each time undressing

himself in front of the five boys, and forcing the boys to do the same. ECF No. 120-1 at 7–9. Doe 371 also alleges that on three occasions Fitzgerald touched Doe 371's crotch area over his clothes during confession in Fitzgerald's mobile chapel/retrofitted Winnebago motorhome. *Id.* at 8–9. At each confession in the vehicle, Fitzgerald asked Doe 371 if he had used his penis before and touched Doe 371's genitals through his clothing. *Id.* Doe 371 testified that the touching lasted "just seconds" and that he was not physically injured as a result of it. *Id.* at 9–10.

## B[8]

Does 121 and 371 bear the burden of showing that their claims come within the TIG policies' coverage. *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013); *see Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 732 (Minn. 1997). "Under Minnesota law, interpretation of an insurance policy . . . is a question of law to be decided by the court." *Nat'l Union Fire Ins. Co. of Pittsburg, Pa. v. Donaldson Co., Inc.*, 926 F.3d 1014, 1020 (8th Cir. 2019). "Where the language of an insurance policy 'is clear and unambiguous,'" it is interpreted "'according to plain, ordinary sense.'" *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co., Inc.*, 825 N.W.2d 695, 704 (Minn. 2013) (citation

---

[8] TIG's coverage period ended June 1, 1979. Does 121 and 371 allege that Fitzgerlad abused them before and after this date. In support of its motion, TIG argued that any injury suffered by Does 121 and 371 after June 1, 1979, is not covered because it did not occur "during the policy period." ECF No. 117-1 at 40. Does 121 and 371 did not address this issue. *See* ECF No. 136. Accordingly, Does 121 and 371 have waived their opposition on this question, and the discussion of their claims is limited to the pre-June 1, 1979 policy period. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Tr.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

omitted).  "If the language of an insurance policy is ambiguous, it must be construed in favor of finding coverage."  *Hamlin v. W. Nat. Mut. Ins. Co.*, 461 N.W.2d 395, 397 (Minn. Ct. App. 1990).  "A policy is ambiguous only if language of the policy reasonably is subject to more than one interpretation."  *Id.* (citing *Columbia Heights Motors v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979)).

Begin with the policy language.  *See Wobig v. Safeco Ins. Co. of Illinois*, 40 F.4th 843, 848 (8th Cir. 2022).  Relevant to this issue, the TIG policies provide: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence."  ECF No. 117-1 at 37.  The policies define "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."  *Id.* at 40.  Minnesota courts, interpreting similar insurance policy language, have held that "bodily injury" requires physical injury to the body, though emotional distress may be sufficient where it is accompanied by appreciable physical manifestations.

In *Clemens v. Wilcox*, the Minnesota Supreme Court held that whether a claimant had sustained a "bodily injury," and whether the bodily injury was "expected or intended by the insured," were questions to be resolved in a declaratory judgment action commenced prior to trial.  392 N.W.2d 863 (Minn. 1986).  In establishing the legal foundation for its decision, the court explained: "In insurance law, 'bodily injury' means physical injury and does not include nonphysical harm such as mental suffering and emotional distress."  *Id.* at 866.

In *Hamlin v. Western Nat. Mut. Ins. Co.*, a former restaurant employee entered into *Miller-Shugart* settlements of sexual harassment claims against her former employer. 461 N.W.2d at 396. Like the language at issue here, the relevant portion of the policy at issue in *Hamlin* "insured against claims for 'bodily injury or property damage,'" and defined "bodily injury" as "bodily injury, sickness or disease." *Id.* at 396–97. The parties agreed that the employee claimed only mental injuries, not bodily injuries. *Id.* The Minnesota Court of Appeals determined that "bodily injury, sickness or disease" unambiguously excluded mental harm; the court noted that other jurisdictions had found such a definition ambiguous, but "only where the mental anguish manifested itself in some physical consequence." *Id.* at 397 (citing *Levy v. Duclaux*, 324 So.2d 1, 10 (La. App. 1975) (holding that definition of 'bodily injury' as sickness or disease was broad enough to include mental distress that required medication), *writ denied*, 328 So.2d 887 (La. 1976)).

And in *Garvis v. Employers Mut. Cas. Co.*, the Minnesota Supreme Court was "presented with five certified questions from the federal district court relating to whether an insurer had a duty under its policy to defend and indemnify a claim for emotional distress asserted by an injured claimant against the insured." 497 N.W.2d 254, 255 (Minn. 1993). In *Garvis*, a plaintiff was in a serious auto accident in which one of her passengers was killed, her son was injured, and she herself was injured. *Id.* Although the plaintiff had thought she had purchased auto insurance before the accident, her insurance agent had failed to process her insurance application. *Id.* While she recovered in the hospital the next day, her insurer (upon learning of the accident) called her to tell her that she did not have coverage for the accident. *Id.* The plaintiff sued, alleging intentional or reckless

25

infliction of emotional distress caused by the telephone call. *Id.*  The at-issue insurance policy defined "bodily injury" as "bodily injury, sickness, or disease sustained by a person." *Id.* at 257.  The first certified question asked whether the allegations in the complaint with respect to infliction of emotional distress set out facts constituting a "bodily injury" for purposes of the policy. *Id.* at 256.  The court answered the question "no," explaining:

> Emotional distress is not an injury to the body, but to the psyche.  Words in an insurance policy are to be given their ordinarily understood meaning, and "bodily injury" in this policy is not ambiguous.  An injury to the body does not include nonbodily emotional distress.

*Id.* at 257 (citing *Clemens*, 392 N.W.2d at 866; *Hamlin* 461 N.W.2d at 397.  The court clarified "that emotional distress with appreciable physical manifestations can qualify as a 'bodily injury' within the meaning of the insurance policy." *Id.*

Does 121 and 371 have not shown that their claims come within the TIG policies' coverage; they have not shown that they were physically injured or that their emotional distress was accompanied by appreciable physical manifestations.  During their depositions, Does 121 and 371 both testified that they did not suffer any physical injuries from Fitzgerald's abuse.  ECF No. 119-14 at 22 ("Q: Did you suffer any physical injuries from any of his abuse? [Doe 121]: No, no physical.  Nope."); ECF No. 120-1 at 8–9 ("Q: Were you injured at all as a result of it? [Doe 371]: Not physically, no.").

Does 121 and 371 identify no record evidence from which a jury might reasonably find or infer physical injury or manifestations.  Nor do they argue that their understanding of the physical-injury concept reflected in their testimony differs in any material way from

the Minnesota courts' description of the concept.  Instead, Does 121 and 371 point to

allegations of physical injury appearing in the operative Amended Complaint in

Intervention and in the Proofs of Claim they each submitted to the Bankruptcy Court and

argue that these allegations create a trial-worthy fact issue.  ECF No. 136 at 29–30 (citing

ECF Nos. 59, 120, 138-14).  In Doe 121's Proof of Claim, for example, he alleged:

> [Doe 121] has suffered from various physical, emotional and
> psychological injuries as a result of the abuse, including, but
> not limited to: depression, anxiety, post-traumatic stress
> disorder, trust issues, self-blaming, feeling uncomfortable in
> groups, feeling less worthy than others, feelings of being
> tainted, loss of sexual desire and activity, relationship and
> intimacy issues, sexual dysfunction, dreams, nightmares,
> flashbacks, sleep issues, feeling of an unfulfilled life, feelings
> of anger, emotional distress, sadness, shame, embarrassment,
> irritability, feelings of weakness, feelings of being powerless,
> medical costs, self-esteem issues, problems with authority,
> suicidal ideation, suicide attempts, feelings of guilt, drug
> abuse, alcohol abuse, and faith, religion and spirituality issues.
> As a result of the abuse, [Doe 121] has very little faith in God.

ECF No. 120 at 14.  Doe 121 alleges that he has taken prescription medication for his

anxiety and depression.  *Id.*  He alleges that his drug abuse has included excessive use of

alcohol, cocaine, speed, marijuana, LSD, and psychedelic mushrooms.  *Id.*  Doe 371 alleges

that he "has suffered from various physical, emotional and psychological injuries as a result

of the abuse by" Fitzgerald.  ECF No. 138-14 at 13.  He alleges that his interest in school

and his grades declined, and that, if not for the abuse, he would have obtained a higher

level of education and pursued a more fulfilling career.  *Id.*  He alleges that he suffers from

low self-esteem, low self-worth, depression, anxiety.  *Id.*  And he alleges that he has gained

weight and was stripped of his faith.  *Id.*

The problem is that these are allegations. TIG has satisfied its "initial responsibility of informing the district court of the basis for its motion" and "identify[ing] the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). As TIG has satisfied this initial burden, the Does 121 and 371 "'must respond by submitting evidentiary materials' of specific facts showing the presence of a genuine issue for trial." *Id.* at 997 (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). Does 121 and 371 "cannot rest on mere denials or allegations." *Id.* (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (internal citations omitted). But resting on allegations is what Does 121 and 371 do when they cite matter appearing in their Amended Complaint in Intervention and bankruptcy Proofs of Claims. *See* Fed. R. Bankr. P. 3001(a) ("A proof of claim is a written statement setting forth a creditor's claim."); *In re Hicks*, 377 B.R. 889, 894 (B.A.P. 8th Cir. 2007) ("[T]he sole purpose of a proof of claim is to allow the creditor to assert a right to participation in the distribution of assets." (citation omitted)). Does 121 and 371 cite no evidence—affidavits, medical records, etc.—to corroborate these allegations or that might contradict or mitigate their deposition testimony. At the summary-judgment stage, this is not enough.

Does 121 and 371 advance several arguments to show that Minnesota law might allow coverage for their claims. They attempt to distinguish the line of Minnesota cases discussed above—*Clemens*, *Hamlin*, and *Garvis*—by arguing that none of these cases involved the sexual abuse of a minor, and by noting that none of the cases involved a significant physical component such as touching, groping, or molestation. ECF No. 136 at

13–14.  They argue that Minnesota treats sexual abuse as physical and bodily injury.  ECF

No. 136 at 11.  To support this contention, Does 121 and 371 cite *Doe v. Archdiocese of*

*St. Paul*, 817 N.W.2d 150, 171 (Minn. 2012), and *Blackowiak v. Kemp*, 546 N.W.2d 1, 3

(Minn. 1996), for the proposition that "as a matter of law, one is injured if one is sexually

abused."  ECF No. 136 at 11.  This is not persuasive.  These cases addressed when

"personal injury" occurs under Minnesota's former "delayed discovery statute," as it

relates to "[t]he statute of limitations on actions for damages based on personal injury

caused by sexual abuse."  *Archdiocese of St. Paul*, 817 N.W.2d at 155 n.1.  Whether an

individual is "personally injured" under a particular statute has no bearing on the definition

of "bodily injury" here.  Regardless, the delayed discovery statute defined "personal

injury" as "bodily harm . . . or severe mental anguish or pregnancy."  Minn. Stat. § 609.341,

subdiv. 8 (1996).  The explicit inclusion of mental anguish in the statutory definition of

"personal injury" makes cases discussing the statute especially distinguishable.[9]

Does 121 and 371 cite cases from other jurisdictions that place controlling weight

on the presence of physical contact.  *Allstate Ins. Co. v. McCranie*, for example, held that

sexual abuse resulting in emotional injuries constituted "bodily injury" because "resulting

emotional injuries can be traced to the sexual abuse, which was the result of physical

---

[9]      Does 121 and 371 rely on *Doe YZ v. Shattuck-St. Mary's School*, 214 F. Supp. 3d
763, 791 (D. Minn. 2016) for its statement: "The Minnesota Supreme Court has recognized
that sexual abuse and injury are coextensive under Minnesota's sexual abuse statute in that
if an abuser's actions constitute criminal sexual conduct, then the victim suffered a physical
injury."  *Shattuck*'s explanation of Minnesota law relies on *W.J.L. v. Bugge*, which
explicitly relied on Minn. Stat. § 609.341's definition of "personal injury."  573 N.W.2d
677, 681 (Minn. 1998) ("For purposes of Minn. Stat. §§ 609.342–609.345, personal injury
is defined as "bodily harm . . . or severe mental anguish or pregnancy.").

contact." 716 F. Supp. 1440, 1443 (S.D. Fla. 1989), *aff'd*, 904 F.2d 713 (11th Cir. 1990).

At oral argument, Does 121 and 371 expanded on this idea, arguing that there is no need

for them to demonstrate physical manifestation of injury because they have more than

that—they have physical contact. ECF No. 161 at 50–54. No Minnesota case so holds.

To apply this rule would be to ignore Minnesota's injury-focused inquiry. *See Garvis,* 497

N.W.2d at 257.

Does 121 and 371 argue that the policies' definition of "bodily injury" does not

require physical injury such as "cuts, bruises, bleeding, or broken bones" because the

definition includes "sickness or disease." ECF No. 136 at 8–9. Does 121 and 371 point to

a Minnesota case that rejected external physical trauma as a requirement for "bodily injury"

where a plaintiff had suffered internal hemorrhaging in a car accident. *Id.* at 9 (citing

*Collins v. Farmers Ins. Exch.*, 135 N.W.2d 503 (Minn. 1965)). There are two problems

with this argument. First, the relevant Minnesota caselaw on this issue *also* interpreted

policies which defined "bodily injury" as including "sickness or disease," and explicitly

held that such language did not include emotional harm. *See Garvis*, 497 N.W.2d at 257.

Second, Does 121 and 371 do not allege they suffered any form of internal physical injury

akin to internal hemorrhaging.

Does 121 and 371 argue that interpreting "bodily injury" to exclude the sexual abuse

of a minor would "ignore[] the profound impact of such abuse, which modern science and

courts have recognized as physical." ECF No. 136 at 24. They cite cases from around the

country discussing the link between physical and psychological injuries, *see Pekin Ins. Co.*

*v. Hugh*, 501 N.W.2d 508 (Iowa 1993), and the physical impact of child sexual abuse.  In

one of these cases, the Indiana Court of Appeals explained:

> That a child is injured is inherent to the crime of child
> molestation.  There is a physical violation of the child's person,
> whether it involves taking hold of a child and forcing the
> child's hand onto one's body . . . or a more heinous violation
> of the child's person.  In any respect, the emotional damage
> results from a physical intrusion upon the child's body and
> therefore is bodily injury.

*Wayne Twp. Bd. of Sch. Comm'rs v. Indiana Ins. Co.*, 650 N.E.2d 1205, 1211 (Ind. Ct.

App. 1995).  Another court explains: "A subjective test suggests that it is possible to molest

a child and not cause some kind of injury, an unacceptable conclusion.  Certainly, one

would and should expect some physical or psychological injury or both, to result from such

acts."  *Atl. Emps. Ins. Co. v. Tots & Toddlers Pre-Sch. Day Care*, 571 A.2d 300, 304 (N.J.

Super. Ct. App. Div. 1990).  Does 121 and 371 also reference multiple research papers

highlighting the links between childhood trauma and adult mental health, suicide, stress,

and the corresponding economic cost.  ECF No. 136 at 25 n.9.  These are all fair and

reasonable points.  The problem is that to rely on these authorities to deny summary

judgment here would be to ignore the controlling Minnesota rule that emotional distress is

not "bodily injury" unless that emotional distress is accompanied by appreciable physical

manifestations.  *Garvis*, 497 N.W.2d at 257.

    Does 121 and 371 have not shown that either of them suffered a bodily injury and

have thus not demonstrated that their claims come within the TIG policies' coverage.

TIG's second summary-judgment motion will be granted.

III

TIG argues that the Intervenors have failed to prove that TIG issued an umbrella policy to the Oblates effective June 1, 1978, through June 1, 1979. ECF No. 107. The Parties have stipulated that TIG issued five liability policies to the Oblates. ECF No. 117-1 at 3. Two were primary policies. Primary Policy 6820357 was in effect from June 1, 1973, to June 1, 1976. *Id.* Primary Policy 8695711 was then in effect from June 1, 1976, to June 1, 1979. *Id.* The primary policies have "limits of liability for bodily injury claims of $300,000 per occurrence and annual aggregate." *Id.* TIG also issued at least three umbrella policies. Umbrella Policy U3507459 was effective from June 1, 1973, to June 1, 1976 "for liability arising out of bodily injury excess of Primary Policy No. 6820357, with limits of liability of $1,000,000 per occurrence and annual aggregate, excess of $300,000 per occurrence and annual aggregate." *Id.* at 4. The second umbrella policy, Umbrella Policy U3579134, was then effective from June 1, 1976, to June 1, 1977, and had limits of liability of $3,000,000 per occurrence and annual aggregate, which was increased, effective July 27, 1976, to $5,000,000 per occurrence and annual aggregate. *Id.* The third umbrella policy, Umbrella Policy U3589025, was effective from June 1, 1977, to June 1, 1978, and had limits of liability of $5,000,000 per occurrence and annual aggregate. *Id.* at 4–5. TIG's role in the Oblates' insurance program ended on June 1, 1979. ECF No. 117-1 at 3–5. St. Paul Fire and Marine Insurance Company then issued the Oblates a primary policy with bodily injury coverage limits of $500,000 per occurrence. Integrity Insurance Company issued the Oblates a "new" umbrella policy, effective June 1, 1979, to December 31, 1980,

which provided coverage of $5,000,000 per occurrence excess of the St. Paul primary policy.  ECF No. 118.  This graphic explains the Oblates' coverage timeline:



ECF No. 134 at 8.

B

The Intervenors claim that TIG issued a sixth policy to the Oblates—an umbrella policy with an effective date of June 1, 1978, to June 1, 1979.  TIG argues that summary judgment is warranted on this issue because the Remaining Intervenors and the Oblates have failed to prove that TIG issued this policy.  ECF No. 109.

"[T]he insured bears the initial burden of demonstrating coverage."  *Bloomington Steel*, 718 N.W.2d at 894.  "[A]s part of the insured's initial burden, the essential terms and conditions of coverage must be proved."  *Domtar,* 563 N.W.2d at 736.  "When the actual

policies have been inadvertently lost or destroyed, the insured may satisfy this burden with circumstantial evidence, such as proof that a particular standard-form policy was issued to the insured." *Id.*

The first legal issue that must be resolved concerns the standard of proof the Intervenors (and Oblates) must meet—a preponderance-of-the-evidence standard or a clear-and-convincing-evidence standard. "Minnesota law does not clearly articulate the proof required of an insured to state a prima facie claim of coverage when the policy is lost or destroyed." *Am. States Ins. Co. v. Mankato Iron & Metal, Inc.*, 848 F. Supp. 1436, 1441 (D. Minn. 1993).

The default rule in Minnesota is the preponderance-of-the-evidence standard. In *Vermillion State Bank v. Tennis Sanitation, LLC*, the Minnesota Supreme Court analyzed, among other things, which of these two standards it should apply when determining whether an oral contract was formed. 969 N.W.2d 610, 626 (Minn. 2022). The court first explained the reasoning behind application of the default standard: "In most civil cases, we use the less rigorous standard, preponderance of the evidence, 'because society has a minimal concern with the outcome of private suits.'" *Id.* (quoting *Christie v. Est. of Christie*, 911 N.W.2d 833, 838 (Minn. 2018)). The court identified two exceptions to this default standard where, because of "'an underlying concern' about fraud and a heightened 'need for certainty surrounding the contract,'" the clear-and-convincing-evidence standard is applied—contracts for the sale of land, and contracts implicating the UCC statute of frauds. *Id.* at 626–27. In particular, it noted that the clear-and-convincing-evidence standard applied "to an oral contract for the sale of land because land has a 'special status'

in the law compared to other forms of property," but further explained that "'claims for breach of other oral contracts may not necessarily present the same' concerns." *Id.* at 627 (quoting *Christie*, 911 N.W.2d at 839–40). The court ultimately applied a preponderance-of-the-evidence standard to the agreement between the parties because "the agreement between [the parties] neither involves land nor implicates the statute of frauds." *Id*. Elsewhere, the court has clarified the delineation between the two standards: "Civil cases involving allegations of fraud or other quasi-criminal wrongdoing may use the intermediate clear and convincing evidence standard because the defendant's interests at stake in those cases are more substantial than those present in a typical civil case." *Carrillo v. Fabian*, 701 N.W.2d 763, 774 (Minn. 2005).

The better answer is to apply the preponderance standard. The purported 1978–1979 umbrella policy between TIG and the Oblates would not have involved a land transaction or implicated a statute of frauds for some other reason. While TIG's interests at stake are substantial in terms of potential monetary value, there is no allegation that TIG has engaged in fraud or quasi-criminal wrongdoing. TIG contends that "[t]here is no reason" why the clear-and-convincing standard should be applied to lost instruments under the UCC and for real property, but not be applied when the lost instrument is an insurance policy. ECF No. 109 at 18 (citing *NAB Asset Venture II, L.P. v. Lenertz, Inc.*, No. C4-97-2181, 1998 WL 422207, at *1 (Minn. Ct. App. July 28, 1998) (unpublished); *Perbix v. Hansen*, 419 N.W.2d 101, 104 (Minn. Ct. App. 1988)). The comparison between a lost insurance policy on the one hand and either the UCC or a real property deed on the other is not clear. The purported umbrella policy seems no more susceptible to fraud than other

types of contracts to which a preponderance of the evidence standard is applied.  *See Vermillion*, 969 N.W.2d at 628.  TIG's interests here are more in line with the "ordinary breach of contract action" at issue in *Vermillion*.  *Id.*

The next issue is whether the Intervenors have identified evidence from which a reasonable juror—applying the preponderance-of-the-evidence standard—could find that the policy existed.  The Intervenors argue that several materials might lead a reasonable juror to that conclusion: (1) a policy number handwritten on a copy of the declarations page from the umbrella policy for the preceding year, 1977 to 1978; (2) a June 24, 1978 memorandum from TIG to a reinsurance broker seeking reinsurance coverage for an Oblates policy; (3) cash disbursement journals which reflect premium payments from the Oblates to TIG in the 1978 to 1979 time period; (4) an umbrella insurance policy that the Oblates purchased from a different insurer, Integrity, effective June 1, 1979, that was labelled as "new[;]" and (5) the terms and conditions of the preceding and subsequent umbrella policies.  I agree with the Intervenors that these documents together might reasonably lead a juror to find that TIG issued the 1978-1979 umbrella policy to the Oblates and that this policy's material terms were unchanged from the 1977-1978 umbrella policy.

(1) The declarations page of the 1977-1978 umbrella policy includes a handwritten note that is circled next to that year's policy number.  ECF No. 117-1 at 212.  The handwritten policy number is U3597101.  *Id.*



*Id.* The Intervenors point out that on two other policy declarations pages, TIG recorded the next year's policy number in substantially this same fashion. The declarations page of the 1973 to 1976 primary policy noted that the policy number of the 1976 to 1979 primary policy was 8695711. ECF No. 138-15.



*Id.* Further, the declarations page of the 1976–1977 umbrella policy noted that the policy number of the 1977–1978 umbrella policy was U3589025. ECF No. 117-1 at 200.



*Id.*  The Intervenors argue, based on TIG's practice of writing the subsequent policy's number on the preceding year's declarations page, at the least a policy number was issued for the 1978–1979 umbrella policy.  ECF No. 134 at 9–11.

TIG reasonably takes issue with multiple aspects of these handwritten notes.  TIG points out that we do not know who wrote the purported policy number, or for what reason.  TIG's searches for all policies issued by TIG to the Oblates, as well as numeric searches for "U3597101," did not identify any policy with such a number.  ECF Nos. 119-4, 119-5, and 119-8.  And during the 1970s, TIG maintained policy registries from which a "TIG underwriter could reserve a sequential policy number in connection with underwriting a potential renewal, but the policy number would not be used if no policy was actually issued."  ECF No. 119-12 at 3.  Thus, "the mere reservation of a policy number by a TIG underwriter does not indicate that a policy was actually issued with that number or any other number."  *Id.*  Accordingly, TIG argues, it is possible that a TIG underwriter could have reserved a policy number while underwriting the potential issuance of the 1978-1979 umbrella policy.  ECF No. 109 at 21.

These are fair points, but the summary-judgment standard answers them. All justifiable inferences must be drawn in favor of the Intervenors. *Anderson*, 477 U.S. at 248. Given TIG's past acts of writing the next year's policy number on the prior policy's declarations page, and the "U" designation which indicates the new number was for an umbrella policy, a reasonable jury could find that the handwritten note shows that a policy number was generated for a 1978–1979 umbrella policy.

(2) The Intervenors rely on a June 24, 1978 memorandum from TIG to a reinsurance broker seeking reinsurance coverage for an Oblates policy. The handwritten memorandum has been transcribed to read:

> Subject: The Reverend Oblate Fathers etal.          Date: 6.24.78
> Message U 358 90 25       Your Lead on FN 5337
>
> Attached please find our rating sheet outlining our underlying premiums and limits.
> The payrolls and operations remain the same. Likewise, there is no change in vehicles.
> The one change that affects the umbrella is for the good. In the past I advised you that there were two infirmaries. Actually there is only one at Madonna Towers and they carry malpractice coverage on this with the Chicago Ins. Co. with 100/300 limits. There are no other infirmaries.
> We are going to exclude the Tekawitha Indian Mission from our policy.
> Please give us your quote for 2,000,000 in excess of 1,000,000 as before.
> Would you be willing to accept 4,000,000 in excess of 1,000,000 – if so what would the premium be?

ECF No. 117-9. A number of Intervenor-favoring justifiable inferences may be drawn from this memorandum. The memorandum is dated June 24, 1978, or 24 days after the purported 1978–1979 umbrella policy would have gone into effect. *Id.* The memorandum shows that TIG was seeking reinsurance for an Oblates umbrella policy shortly after the start of the purported umbrella policy period. Attached to the memorandum is the rating

sheet for the 1977–1978 umbrella policy (Umbrella Policy U3589025).  *Id.*; ECF No. 150.

The memorandum states that while "[t]he payrolls and operations remain the same" and

"there is no change in vehicles," the one change is that there is only one infirmary.  ECF

No. 117-9.   Further, the memorandum requests a quote for "4,000,000 in excess of

1,000,000."  *Id.*   The umbrella policies for both before and after the policy period at issue

both had limits of liability for $5,000,000 per occurrence.  ECF No. 117-1 at 4–5; ECF No.

118.  These facts point to not only the existence of the 1978–1979 umbrella policy, but its

terms.   As TIG points out, the statement that TIG was "*going to* exclude the Tekakwitha

Indian Mission from [its] policy" could be read to mean that the policy had not taken effect.

*See* ECF No. 117-9 (emphasis added).   But that is not a necessary inference.   The record

demonstrates that in prior years, TIG had excluded Oblates-related entities from coverage

after the policy was in force.  *See* ECF No. 117-1 at 201 (excluding King's Home Society

on October 25, 1976).

(3)  The Intervenors rely on cash-disbursement journals that reflect premium

payments from the Oblates to TIG in the 1978 to 1979 time period.   These journals log

disbursements from 1974 to 1979.  ECF Nos. 118-2, 118-3, 118-4.  The first three months

of 1978 are logged as follows:

- January 1978: $15,158.18
- February 1978: $15,088.92
- March 1978: $15,086.92

ECF No. 118-4 at 2–4.  There is a gap until August 1978.  *Id.* at 5.  These payments are

logged as follows:

- August 1978: $48,674
- August 1978: $39,134 ("$19,567 x 2 – July 1 – Aug. 1")
- September 5, 1978: $19,566.97
- September 20, 1978: $19,566.99
- October 1978: $19,566.99
- November 1978: $19,566.99
- December 1978: $19,566.99
- January 1979: $19,566.99
- February 1979: $19,395.99
- March 1979: $19,568.10

*Id.* at 5–14. The Intervenors argue that the increase in the monthly payments to TIG in the 1978 to 1979 policy period (which would have begun in June 1978) show that the Oblates did not let their $5,000,000 in umbrella coverage lapse, and that they did not purchase an umbrella policy from another insurer. ECF No. 134 at 15.

TIG challenges the admissibility of the cash disbursement journals. Under Federal Rule of Civil Procedure 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). "[W]hen such an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.*

To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R.

41

Evid. 901(a).  "To authenticate evidence, a party must clear only a low bar." *United States v. Lamm*, 5 F.4th 942, 947 (8th Cir. 2021) (quotation omitted).  "The party authenticating the exhibit 'need only prove a rational basis for that party's claim that the document is what it is asserted to be." *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010) (quoting *United States v. Wadena*, 152 F.3d 831, 854 (8th Cir. 1998)).  Put another way, "Federal Rule of Evidence 901 'require[s] only enough evidence that a jury could have reasonably concluded that a document was authentic.'" *United States v. Williams*, 865 F.3d 1328, 1343 (11th Cir. 2017).  "This may be done with circumstantial evidence." *Jones*, 608 F.3d at 1045.  To authenticate an ancient document, the proponent must show that the document "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered."  Fed. R. Evid. 901(b)(8).

TIG argues that the elements of Rule 901(b)(8) are not met, and the journals are thus inadmissible, because "neither Oblates 30(b)(6) witness could testify what the document was, who maintained it, who was responsible for it, or what the entries in the document mean."  ECF No. 109 at 23.  The Oblates' 30(b)(6) witness, Carrie Huff, testified that the journals were found in an Oblates storage facility in Washington, D.C.  ECF No. 119 at 17 (A: "[E]verything here is a handwritten financial journal, some are cash disbursement journals, some are general ledger pages generally identified in the caption at the top.  Q: Where were these documents found?  A: I believe they were in the Central Province records collection in DC at the time.").  TIG contends that Huff had no basis for her testimony because "[w]hen these documents were allegedly created, Huff had not begun law school;

she did not start representing the Oblates until 35 years later." ECF No. 147 at 6. The problem is that Huff's lack of firsthand or real-time personal knowledge is no problem in this context. Rule 30(b)(6) designees must testify on matters "not only within his or her personal knowledge, but also on matters reasonably known by the responding entity." *All. for Glob. Just. v. Dist. of Columbia*, 437 F. Supp. 2d 32, 37 (D.D.C. 2006) (citation omitted); *see* Fed. R. Civ. P. 30(b)(6) (requiring that a designee "must testify about information known or reasonably available to the organization").

(4) The Intervenors rely on an umbrella insurance policy the Oblates purchased from Integrity that was labeled "new" and was effective June 1, 1979. They argue that the note stating it is "new" is "highly relevant" because it indicates that the Integrity policy is not a renewal from the previous year, "thus ruling out any possibility that Integrity, rather than TIG, sold Oblates the 1978-1979 Umbrella Policy." ECF No. 134 at 22. This material's relevance is unclear. The fact that the Integrity policy is labeled "new" says nothing about whether TIG issued the Oblates an umbrella policy for the 1978-1979 period.

(5) The Intervenors argue that the material terms and conditions of the 1978-1979 umbrella policy can be inferred from the contents of the prior TIG umbrella policies and the subsequent Integrity umbrella policy. The June 1978 reinsurance memorandum noted only two changes from the referenced 1977-1978 umbrella policy—that there was only one infirmary, and that TIG was "going to exclude the Tekakwitha Indian Mission from [its] policy." ECF No. 117-9. The Integrity policy had the same $5,000,000 limit of liability as the 1976-1977 and 1977-1978 umbrella policies, ECF No. 117-1 at 4; ECF No. 118, the same retained limit of $10,000 as the 1977-1978 umbrella policy, ECF No. 117-1 at 212;

ECF No. 118 at 2, and like the 1977-1978 umbrella policy, it contained follow-form language, ECF No. 117-1 at 216; ECF No. 118 at 2–8.  These similarities evidence that the material terms of coverage in the 1978-1979 umbrella policy did not change from those in the 1977-1978 umbrella policy.

The Intervenors' evidence goes beyond that described in *Boyce Thompson Inst. for Plant Rsch., Inc. v. Ins. Co. of N. Am.*, where the "mere mention of a policy number in another document" was insufficient to prove the existence of insurance coverage.  *See* 751 F. Supp. 1137, 1140 n.2 (S.D.N.Y. 1990).  The Intervenors' evidence shows: (1) a new umbrella policy number was created; (2) on June 24, 1978, TIG was seeking reinsurance coverage for an Oblates policy; (3) that the Oblates continued to pay TIG from 1978 to 1979, and that the payment amounts increased during that period commensurate with an umbrella policy; and (4) that the limits of liability and retained limits for the Oblates' umbrella policies were the same both before and after the alleged umbrella coverage period.  On these facts, a reasonable jury applying the preponderance of the evidence standard could conclude that TIG issued the Oblates an umbrella policy from 1978 to 1979 with the same material terms and conditions as the 1977-1978 umbrella policy, and the subsequent Integrity policy.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Plaintiff TIG Insurance Company's Motion for Summary Judgment that Coverage is Barred Because the Oblates Expected the Harm Fitzgerald Caused Intervenors [ECF No. 97] is **DENIED**.

2.      TIG's Motion for Summary Judgment that Does 121 and 371 are not Entitled to Coverage Under the TIG Policies [ECF No. 102] is **GRANTED**.

3.      TIG's Motion for Summary Judgment that Intervenors and Oblates have Failed to Prove that TIG Issued an Umbrella Policy Effective June 1, 1978 to June 1, 1979 [ECF No. 107] is **DENIED**.

4.      Missionary Oblates of Mary Immaculate's Motion for Joinder in the Counterclaimant-Intervenors' Response to Plaintiff's Motion for Partial Summary Judgment on the TIG 1978-1979 Umbrella Policy [ECF No. 140] is **GRANTED**.

5.      Missionary Oblates of Mary Immaculate's Motion for Joinder in the Counterclaimant-Intervenors' Response to Plaintiff's Motion for Partial Summary Judgment that Does 121 and 371 are Not Entitled to Coverage under the Policies [ECF No. 141] is **GRANTED**.

6.      Missionary Oblates of Mary Immaculate's Motion for Joinder in the Counterclaimant-Intervenors' Response to Plaintiff's Motion for Partial Summary Judgment on Expected Harm [ECF No. 142] is **GRANTED**.


Date:  October 24, 2023                          s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court