UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

TIG Insurance Company, *f/k/a*
*Transamerica Insurance Company*,

      Plaintiff and Counter
      Defendant,

v.

Missionary Oblates of Mary Immaculate,
*f/k/a The Reverend Oblate Fathers*,

      Defendant and Counter
      Claimant,

and

Doe Nos. 86, 329, and 330,

      Counter Defendants and
      Intervenors.

File No. 20-cv-2261 (ECT/JFD)

**OPINION AND ORDER**

---

Trial in this case begins Monday, February 26, 2023.  *See* ECF No. 171.  In anticipation of trial, TIG Insurance Company and Doe Nos. 86, 329, and 330 have filed motions in limine.  TIG has filed six motions, *see* ECF Nos. 192–93, 195–98, and the Does have filed one motion, *see* ECF No. 206.  Missionary Oblates of Mary Immaculate joins the Does' motion, *see* ECF No. 212, and joins the Does' responses to TIG's motions, *see* ECF Nos. 226–231.  This order addresses all motions.

*TIG's Motion No. 1 – ECF No. 192*

TIG moves, "pursuant to Evidence Rules 402 and 403, to preclude Intervenors and Oblates from offering into evidence an umbrella insurance policy issued to Oblates by

Integrity Insurance Company for the period June 1, 1979–December 31, 1980 (the 'Integrity Policy' . . .) and any percipient or expert testimony relating thereto." ECF No. 192 at 1.[1] In TIG's view, the Integrity Policy is not relevant to any issue in the case, and if it was, the admission of the policy or testimony regarding the policy would waste time and confuse or mislead the jury. *Id*. This motion will be denied.

Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." "[E]vidence relevance is a low bar." *Cottrell ex rel. Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 997 (8th Cir. 2016). Evidence that is not relevant is inadmissible at trial. Fed. R. Evid. 402. Relevant evidence may be excluded when "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Here, the Integrity Policy is relevant. Considered alongside the Oblates' purchase of umbrella policies in effect from 1973 to 1978, the Integrity Policy (in effect from 1979 to 1980) tends to show that the Oblates intended to include an umbrella policy in their insurance program. That, along with other admitted evidence, might reasonably lead a juror to conclude that the Oblates intended to purchase umbrella coverage during the 1978–1979 period. At trial, TIG may advocate its view that the Integrity Policy should not be

---

[1]     Page citations are to pagination assigned by CM/ECF, appearing in a document's upper right corner, not to a document's original pagination.

given any weight through witness examination and argument, thus minimizing the risks of unfair prejudice and juror confusion.

*TIG's Motion No. 2 – ECF No. 193*

TIG moves "to exclude from evidence any testimony from [the Oblates' corporate representatives] Carrie Huff or Rufus Whitley regarding a purported 'cash disbursements journal' . . . including the meaning of handwritten markings and annotations therein." ECF No. 193 at 1. Huff and Whitley lack personal knowledge regarding the journal's contents. Therefore, TIG argues, "Rule 602 . . . prohibits the use of Huff's and Whitley's testimony to authenticate the journal or establish its purported meaning and significance." *Id.* at 3–4. The Does represent that Huff and Whitley will testify only to authenticate the journal, not to explain the document's contents. ECF No. 218 at 2. This motion will be denied to the extent it seeks exclusion of Huff and Whitley's authentication-directed testimony; it will be granted to the extent it seeks exclusion of their testimony regarding the journal's meaning and significance.

This motion—and specifically TIG's lack-of-personal-knowledge argument—implicate two evidence concepts. The first is the general requirement that a fact witness testify on personal knowledge: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. The second—also raised in TIG's Motion No. 3—is the so-called "ancient documents rule." Under this rule, the proponent of an ancient document—that is, a document that "is at least 20 years old when offered," Fed. R. Evid. 901(b)(8)(C)—authenticates the document by showing the document "is in a condition that

3

creates no suspicion about its authenticity" and "was in a place where, if authentic, it would likely be."  Fed. R. Evid. 901(b)(8)(A), (B).  A witness whose testimony is offered to authenticate an ancient document need not possess personal knowledge regarding the document's contents.  *See id.*; *see also Century Indem. Co. v. Marine Group, LLC*, No. 3:08-cv-1375-AC, 2015 WL 13673517 at *2 (D. Or. Oct. 29, 2015) ("St. Paul's contention that an ancient document requires a witness with personal knowledge of the information contained in the document inserts into the rule a requirement the rule does not impose.").  Once authenticated, the general rule is that a statement in an ancient document is not excluded by the rule against hearsay.  Fed. R. Evid. 803(16).

Here, Huff and Whitley's lack of personal knowledge regarding the journal's contents means they may not testify on that subject.  In other words, as the Does concede, Huff and Whitley could not properly testify regarding the meaning or significance of any journal entry.  At the same time, however, Huff and Whitley's lack of personal knowledge regarding the journal's contents does not prevent either of them from testifying in support of the journal's authenticity under Rule 901(8).

*TIG's Motion No. 3 – ECF No. 195*

With its third motion, TIG seeks outright exclusion of the cash disbursements journal under Rules 802, 803, 901, 1002, and 403.  ECF No. 195 at 1.  TIG identifies three justifications for this motion: (1) that the journal is hearsay; (2) that the Does are not capable of authenticating the journal; and (3) that the absence of a witness with personal knowledge regarding the journal's contents would leave the jury to speculate—or be misled—regarding the journal's significance, if any.  *Id.* at 3.  This motion will be denied.

4

Begin with the authentication question.  As noted in analyzing TIG's second motion, the journal's more-than-twenty-years-old age makes it an "ancient document" for purposes of Rule 901(b)(8), and it may be authenticated by testimony showing that it "is in a condition that creates no suspicion about its authenticity" and "was in a place where, if authentic, it would likely be."  Fed. R. Evid. 901(b)(8)(A), (B).[2]  To determine whether an ancient document creates no suspicion about its authenticity, a court should ask not about the reliability of the document's contents, but "whether the condition of the item provides reason to doubt that the item is what it is purported to be."  31 Charles Alan Wright and Victor J. Gold, *Federal Practice and Procedure: Evidence* § 7113 (2d ed. 2021).  "This necessarily focuses attention on matters intrinsic to the item that raise suspicions such as erasures, missing parts, misspellings, changes in handwriting, unusual format, anachronistic content, and a freshness of appearance that belies age."  *Id.*  Determining whether a document was in a place it would likely be involves a fact-specific, common-sense inquiry.  *See id.*  "For example, where the item is purported to be a document written by a particular individual, evidence that it was found in the custody of that individual, where his possessions were located, or in some other place identified with the individual may be sufficient to satisfy the provision."  *Id.*; *see United States v. Habteyes*, 356 F. Supp. 3d 573, 581–83 (E.D. Va. 2018) (finding that ledger showing distribution of weapons to Ethiopian revolutionaries had been properly authenticated as ancient document).

---

[2]     Because the Does rely only on the ancient-records hearsay exception to justify the journal's admission, TIG's separate argument that the business-records exception does not apply, *see* ECF No. 195 at 4–8, need not be addressed.

TIG has not shown that the Does will be unable to authenticate the journal as an ancient document in the way Rule 901(b)(8) requires.  TIG does not question the journal's more-than-twenty-years-old age.  TIG does not seem to argue that the journal's physical condition raises suspicions concerning its authenticity.  Huff testified that the journal was found "in the Central Province records collection in DC."  ECF No. 199-3 at 8.  Whitley testified that Oblates financial records, if they existed, would have been kept in St. Paul, then moved to Washington, D.C., and then moved to San Antonio.  ECF No. 199-4 at 9.  It makes sense that an Oblates cash-disbursements journal from the late-1970s would be found in the Oblates' archives.  It is true that testimony concerning the location of the journal's discovery is not specific.  But I conclude that this testimony is enough to show at least that the Does may be able to introduce evidence at trial that, in turn, may reasonably justify a finding that the journal was found in a place it would likely be.

Apart from Rule 901(b)(8)'s three listed elements, TIG argues that the journal cannot be authenticated as an ancient document because no witness has sufficient knowledge regarding the document's creation, maintenance, or purpose.  To support the idea that this sort of knowledge is necessary to authenticate an ancient document, TIG cites *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000).  There, a witness—a Michigan Department of Natural Resources employee—attempted at trial to authenticate a "purported[ ] EPA report," as an ancient document.  *Kalamazoo River Study Grp.*, 228 F.3d . at 661.  The witness "was unable to state with certainty that the document was even prepared by the EPA; he could only state that it was his belief that the document 'was a page out of an EPA report if I recall correctly,'" and he could "not establish why

6

the document was in the [DNR's] files." *Id*. at 662.  The district court determined that the document had not been authenticated and excluded it.  *Id*.  On abuse-of-discretion review, the Sixth Circuit affirmed.  *Id*.

This argument, and TIG's reliance on *Kalamazoo River Study Group*, are not persuasive.  (1) Rule 901(b)(8) identifies three relatively straightforward elements essential to authenticating an ancient document.  Requiring a witness to testify on personal knowledge regarding an ancient document's creation, maintenance, or purpose is not among them.  Sixth Circuit cases decided after *Kalamazoo River Study Group* do not impose or add this requirement.  *See United States v. Mandycz*, 447 F.3d 951, 966 (6th Cir. 2006) (affirming district court decision to admit Soviet interrogation records as ancient documents); *see also LensCrafters, Inc. v. Wadley*, 248 F. Supp. 2d 705, 739–40 (M.D. Tenn. 2003), *amended in part* (Feb. 26, 2003), *aff'd sub nom. LensCrafters, Inc. v. Robinson*, 403 F.3d 798 (6th Cir. 2005) ("These exhibits are more than 20 years old and were produced in response to a subpoena issued to the Tennessee Optometric Association. Thus, they indisputably satisfy the second and third requirements for authentication under Fed. R. Evid. 901(b)(8).").  The better answer, then, is that Rule 901(b)(8) does not require testimony based on a witness's personal knowledge regarding an ancient document's creation, maintenance, or purpose to authenticate the document.  (2) If some evidence regarding an ancient document's creation, maintenance, or purpose were essential to authentication, that evidence seems present here in the journal itself.  For example, the document includes the heading "Cash Disbursements Journal" on its pages, and it includes a title page that reads: "Oblates Fathers Central Province USA."  *See* ECF Nos. 199-5; 223-

6.  (3) *Kalamazoo River Study Group* is distinguishable.  There, the court reviewed a mid-trial decision to exclude evidence based on trial testimony.  Here, TIG seeks pre-trial exclusion based on its argument that the Does will not be able to authenticate the journal as an ancient document.  TIG has not made that showing.  Whether the Does carry their authentication burden at trial remains to be seen.

TIG's hearsay and prejudice objections may be addressed briefly.  In view of Rule 803(16), TIG's hearsay objection is not persuasive.  As noted, upon authentication, Rule 803(16) says that an ancient document is not excluded by the rule against hearsay.  Assuming there are no other exclusion-worthy problems, the document is admitted into evidence and is fair game for attorney argument and perhaps expert testimony.  TIG's Rule 403 concern—that the jury may be misled into giving the journal weight it does not deserve—may be addressed through the testimony of TIG's witnesses, cross-examination of the Does' witnesses, and attorney argument.

*TIG's Motion No. 4 – ECF No. 196*

TIG moves to exclude all opinions and testimony of the Does' proffered insurance expert, Professor Jeffrey E. Thomas.  ECF No. 196 at 1.  Rule 702 governs the admissibility of expert testimony.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

8

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "District courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007). There are a number of factors courts may consider in determining whether an expert's testimony is the product of "reliable principles and methods," including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Id.* "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted). But the court must exclude an expert's opinion if it "is so

9

fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (quotation omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Furthermore, "under *Daubert* and Rule 403 of the Federal Rules of Evidence, the probative value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *United States v. Solorio-Tafolla*, 324 F.3d 964, 966 (8th Cir. 2003).

Professor Thomas is the Daniel L. Brenner Faculty Scholar, Professor of Law, and Associate Dean for Strategic Initiatives and Graduate Programs at the University of Missouri–Kansas City School of Law, where he teaches insurance law, among other subjects. ECF 199-6 at 7, 9. Previously, Professor Thomas served at the University of Missouri-Kansas City School of Law as assistant professor from 1993–1999, as associate professor from 1999–2004, and as full professor since 2004. *Id.* at 9. During that time, Professor Thomas also taught insurance law as a visiting faculty member at the University of Connecticut School of Law and as an adjunct professor at Loyola Law School in Los Angeles. *Id.* Professor Thomas also has served as a Fulbright lecturer on insurance law at the Nankai University Department of Law in Tianjin, China. *Id.* Professor Thomas's publications include dozens of journal articles, treatises, supplements, and continuing legal education materials regarding insurance law, *see id.* at 10–16, and he has presented on dozens of insurance-related subjects, *see id.* at 16–21. Professor Thomas has served several professional insurance-law organizations, including as a member of various insurance-related committees and task forces of the Tort Trial and Insurance Practice Section of the

American Bar Association, an Honorary Fellow of the American College of Coverage

Counsel, an Adviser to the Restatement of the Law of Liability Insurance project. *Id*. at 7,

22. Professor Thomas earned his law degree from the University of California, Berkeley,

and his undergraduate (Bachelor of Arts) degree from Loyola Marymount University. *Id.*

at 9–10.

In his report, Professor Thomas offers the following opinions:

> a. Oblates purchased an umbrella policy from TIG for the policy period of June 1, 1978, to June 1, 1979, with policy limits of $5,000,000 per occurrence and an Annual Aggregate (where applicable) of $5,000,000.
>
>> i. The umbrella policy provided excess coverage above a primary policy issued by TIG providing blanket liability and personal injury coverage from June 1, 1976, to June 1, 1979, policy number 8695711.
>>
>> ii. This umbrella policy very likely provided coverage for any claims covered by the primary policy issued by TIG applicable to that policy period (policy number 8695711) that were in excess of the primary limits.
>
> b. The insurance purchased by Oblates from TIG for policy periods that cover more than one year under insurance industry custom and practice would apply their limits for each policy year.

*Id.* at 2.

Whether Professor Thomas's testimony should be excluded presents a close

question. Professor Thomas's qualifications are not the problem. He possesses extensive

specialized insurance-law and insurance-industry knowledge. This specialized knowledge

is reflected throughout Professor Thomas's curriculum vitae, particularly in the list of

insurance-law related journal articles he has authored and treatises he has edited. *See id.*

11

at 10–13.   Professor Thomas's specialized insurance knowledge extends to "insurance industry custom and practice."   *Id.* at 3.   Certainly in the abstract, expertise of the kind Professor Thomas possesses would help the jury in this case to understand the evidence and determine a fact in issue.   A juror reasonably might be expected to understand insurance basics.   But after that, insurance law and practice can get complicated pretty quickly, and it seems unreasonable to presume that a juror would be familiar with the insurance industry customs and practices at issue here.   The gaps TIG has identified in the materials Professor Thomas reviewed are not so great as to warrant exclusion but go instead to the credibility of Professor Thomas's testimony.   *Bonner*, 259 F.3d at 929.

What makes this issue difficult is that Professor Thomas's report does not consistently draw an explicit link between his insurance expertise and his opinions.   For example, as I understand it, Professor Thomas opines that handwritten notes on the declarations page of the TIG umbrella policy covering June 1, 1977, to June 1, 1978, show TIG issued a like policy covering June 1, 1978, to June 1, 1979.   ECF No. 199-6 at 3.   As support for this assertion, Professor Thomas asserts: "In the process of obtaining a new policy, it is common for the insurance producers to use the prior policy's declaration page as a basis for identifying the terms of the new policy because the new policy often has the same or similar coverages for the next policy period."   *Id.*   Fair enough.   But the handwritten notes central to this opinion go beyond merely using the prior policy's declarations page as a coverage reference point, and Professor Thomas does not describe a clear link between his specialized insurance knowledge and notations of this sort. Essentially this same criticism could be made of Professor Thomas's opinions that the

alleged 1978–1979 umbrella policy used a premium-finance arrangement similar to the 1977–1978 policy and that the 1978–1979 policy likely provided the same coverage as the 1977–1978 policy—that is, the connections Professor Thomas draws in his report seem more factual- than expert-grounded.

Regardless, the better decision, I think, is not to exclude Professor Thomas's testimony on this basis. Though Professor Thomas's report does not consistently draw explicit links between his expertise and his opinions, it is reasonable to infer that Professor Thomas's opinions depend on those links. There is no suggestion that the report does not comply with Federal Rule of Civil Procedure 26(a)(2)(B)(i). And in his deposition, Professor Thomas added testimony more clearly connecting the dots between the record evidence, his insurance expertise, and his opinions. *See, e.g.*, ECF No. 199-2 at 11–12. For all these reasons, then, TIG's motion to exclude Professor Thomas's opinions and testimony will be denied.

*TIG's Motion No. 5 – ECF No. 197*

TIG moves to preclude Does 86, 329, 330, and 155 from testifying at trial. ECF No. 197 at 1. To recap, there are two issues to be tried. TIG describes the issues as follows: "(i) whether the Oblates knew or should have known, before Fitzgerald abused the Intervenors, that his past abuse of children would likely recur if action was not taken; and (ii) whether TIG issued an alleged June 1, 1978–June 1, 1979 umbrella policy to the Oblates." *Id.* at 3. TIG argues that any testimony the Does might provide would not be relevant to either issue, that the Does lack personal knowledge regarding either issue, that their testimony would be unfairly prejudicial, and that any testimony concerning the

reasonableness or negotiations of the Does' *Miller-Shugart* agreements would violate stipulations made among the Does, the Oblates, and TIG.  *See id.* at 3–4.  This motion will be denied in part and granted in part.

TIG's motion will be denied to the extent the Does' testimony concerns the circumstances of their abuse and necessary introductory testimony.  This testimony is relevant in two ways.  First, it places the issues to be tried in context.  Fitzgerald's abuse of the Does is this case's origin.  Second, the testimony will be relevant to whether the Oblates knew or should have known from Fitzgerald's past abuse that he would abuse again.  The similarity or dissimilarity of the circumstances of Fitzgerald's past abuse as compared with the circumstances of his abuse of the Does "has a[] tendency to make" the fact of the Oblates' knowledge "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).  The potential the Does' testimony on these matters holds for unfair prejudice or jury confusion may be addressed through cross-examination, lawyer argument, and instructions, including perhaps a limiting instruction.  Beyond that, TIG's motion will be granted.  The Does have not shown why their testimony regarding other matters—for example, their injuries, their monetary damages, other consequences of Fitzgerald's abuse, etc.—might be relevant to the two issues to be tried.

*TIG's Motion No. 6 – ECF No. 198*

TIG moves to exclude the opinions and testimony of the Does' child-sexual-abuse history expert, Professor Philip Jenkins.  ECF No. 198 at 1.  Professor Jenkins is Distinguished Professor of History and Co-Director for the Program on Historical Studies of Religion, Institute for Studies of Religion at Baylor University, positions he has held

since 2012. ECF No. 199-10 at 2, 19. From 1980 to 2011, Professor Jenkins taught in various capacities at Pennsylvania State University, where he remains Emeritus Edwin Erle Sparks Professor of Humanities. *Id*. at 2. Professor Jenkins holds B.A., M.A., and Ph.D. degrees in history from the University of Cambridge. *Id*. at 19. He has published "thirty sole-authored books and over one hundred book chapters and refereed articles, in addition to numerous book reviews and journalistic articles." *Id*. at 2. Professor Jenkins has "researched and published on a number of different topics in the areas of history (including church history), as well as criminal justice and criminology, violent crime, social theory, and social problems," and he has "published on changing concepts of sexual abuse and molestation in American history" and "sexual abuse by clergy." *Id.*

In his report, Professor Jenkins offers the following opinions:

1. Attitudes to child sexual abuse and molestation have changed dramatically over time, and so have the kinds of response thought necessary or appropriate. This historical context is critical to understanding the responses of organizations or institutions responding to incidents of child sexual abuse.

2. During the years from the mid-1950s through the mid-1970s, the best expert and professional opinion about child sexual abuse systematically minimized or trivialized the scale and severity of child sexual abuse, and recommended responses that in retrospect appear extremely and unreasonably mild and non-interventionist.

3. That trivialization of sexual abuse extended to minimizing the likelihood that offenders would repeat their acts, especially if they had been offered any kind of therapy or treatment.

4. Changing social and therapeutic attitudes to adult homosexuality had the wholly unintended consequence of raising confusion about the appropriate response to cases in which adult men abused or molested underage teenage boys.

> Particularly during the 1970s, this contributed to the larger tendency to trivialize the response to adult sex offenders, and to minimize the harm to victims.

> 5. In cases that came to light prior to 1980, under the opinions and standards recommended by the best secular expert opinion prevailing at the time, in no instance in those years could or should the Order have been aware that there was a substantial probability of reoffending.

> 6. From the mid-1980s, the Oblates became aware of other misconduct allegations made against Fr. Fitzgerald, and they should have intervened forcefully to minimize his opportunities to commit abusive acts.

*Id.* at 5.  Based on these opinions, Professor Jenkins concludes:

> During the 1960s and 1970s, the Oblates order became aware of two acts of sexual misconduct alleged against Fr. Fitzgerald. According to the scholarly and professional standards prevailing in these years, neither of those acts would or should have been understood as constituting a likelihood of future repetition.

*Id.* at 18.

There are three problems with Professor Jenkins's proffered testimony that together warrant its exclusion.  (1) It is difficult to understand how most of the proffered testimony "will help the [jury] to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The fact issue to be tried "is whether a reasonably prudent person in the Oblates' position knew or should have known that Fitzgerald's abuse of the Intervenors was substantially probable as a result of the continuing exposure caused by the Oblate's actions."  *TIG Ins. Co. v. Missionary Oblates of Mary Immaculate*, No. 20-cv-2261 (ECT/JFD), 2023 WL 7001760, at *5 (D. Minn. Oct. 24, 2023).  As the Eighth Circuit explained in *Diocese of Winona v. Interstate Fire & Casualty Co.*, this question is answered

by determining the insured's knowledge of its agent's past acts of sexual abuse and then answering whether, based on that knowledge, the insured knew or should have known that future abuse was highly likely to occur. 89 F.3d 1386, 1392–96 (8th Cir. 1996). Most of the opinions Professor Jenkins describes in his report address matters that seem unrelated— or are at least quite tangential—to this fact question. These opinions describe society's changed attitudes regarding child sexual abuse, trivialization of sexual abuse, and "mild and non-interventionist" organizational responses to reports of sexual abuse. ECF No. 199-10 at 5. Accept that these opinions accurately describe historical patterns. These historical patterns do not answer the to-be-tried questions. Accepting that an organization in the 1960s was more likely to trivialize its agents' acts of sexual abuse, for example, says nothing about the extent of that organization's knowledge of those acts; it just suggests that, regardless of what the organization knew, it was more likely to trivialize that knowledge. And accepting the idea that an organization's historical tendency to trivialize acts of child sexual abuse might reduce the perceived risk of future harm posed by the perpetrator or perpetrators of those acts cannot be reconciled with the Eighth Circuit's approach to the issues in *Diocese of Winona*.

(2) One of Professor Jenkins's opinions might help the jury understand the Oblates' knowledge of the risks raised by Fitzgerald's past abuse, but this opinion is not "based on sufficient facts or data." Fed. R. Evid. 702(b). As I understand it, Professor Jenkins would testify that the prevailing view prior to 1977 (or perhaps 1980) was that sexual abusers of children were unlikely to reoffend if they received any kind of therapy or treatment. ECF No. 199-10 at 5, 9, 10–12. Professor Jenkins does not connect this opinion to this case's

17

facts, however.  He does not, for example, identify evidence showing that the Oblates held this view,[3] or that the Oblates arranged for Fitzgerald to undergo therapy or treatment directed at his history of child sexual abuse.  Without this link, the better answer is that this opinion lacks sufficient factual support to be applied to this case or to admit this aspect of Professor Jenkins's proffered testimony at trial.

(3) A portion of Professor Jenkins's proffered testimony does not reflect the application of reliable principles and methods.  Fed. R. Evid. 702(c), (d).  In the final section of his report, Professor Jenkins reviews the allegations regarding Fitzgerald's acts of child sexual abuse (on which TIG will rely at trial to show the Oblates' knowledge and the substantial probability of Fitzgerald's abuse of the Does).  *See* ECF No. 199-10 at 13–17.  Professor Jenkins opines that this evidence does not show the Oblates possessed the requisite knowledge or the substantial probability of future abuse.  The problem is that almost all of Professor Jenkins's analysis of this evidence is merely factual and reflects no connection to his expertise as an historian.  He analyzes this evidence in the same way a juror might (or the same way the Does' lawyer might argue it should be understood).  The analysis of the Sisseton, South Dakota incidents is representative.  There, Professor Jenkins explains why he concludes that Fitzgerald's relocation away from Sisseton did not result from allegations of sexual misconduct:

> The chain of causation here must be examined carefully.  In the
> words of the Complaint for Declaratory Relief in the present

---

[3]      Professor Jenkins acknowledged in his deposition that he has no "basis to believe that the Oblates' administration in the 1960s or 1970s were looking at or were familiar with secular literature in the areas of psychology, psychiatry, sexual activity, [or] psychosexual activity."  ECF No. 199-11 at 5.

case, "Upon information and belief, the Oblates' Provincial became aware of Father Fitzgerald's alleged abuse of these minors and responded by assigning him to a new position within the Diocese of Duluth." The phrasing suggests that the new assignment was a direct consequence of the abuse, and its discovery: the Provincial "responded." However, it is not clear that this move was in any sense connected with the sexual allegation. Indeed, it is far from certain that the order accepted the genuineness of that allegation, still less its seriousness. Superiors were aware that Fitzgerald had reported some possible issue or conflict, but the available evidence suggests that they did not understand it as an instance of abuse or molestation.

There were ample grounds for the order to have moved Fitzgerald away from Sisseton, quite apart from any sexual allegation. At the time of the alleged offenses, Fitzgerald was involved multiple disputes and factional fights, as would frequently occur throughout his career, in various settings, but which were in no way connected to sexual misbehavior. Over the years following this alleged incident at Sisseton, various figures within the Oblates wrote about problems that Fitzgerald had encountered, including his handling of money, and personal conflicts. There are also several references to personal issues that Fitzgerald faced, including his disappointments in his career and his professional life. His difficulties in dealing with authority are often mentioned. Although the passage comes from a letter written much later, in 1989, many earlier episodes confirm the message that "when [Fitzgerald] gets involved in administration things can become complicated very quickly. Many times his own personal finances become intertwined with ministry finances, and this can obviously lead to difficulties and misunderstandings . . . we have spoken to him at various times concerning his administrative and financial style." In 1992, Provincial James Deegan wrote that, "Currently, Father Fitzgerald's personal file is one of the largest ones we have on any of our community members. His file indicates a history of difficult relationships with parishioners, misunderstandings over financial management of parishes, and a pervasive feeling that he has never been accepted by his Oblate superiors." In the specific case of Tekakwitha House, a feud between another priest and

> the order of nuns active on the premises had created a
> thoroughly toxic work environment for everyone present.

*Id.* at 14–15 (footnotes omitted).  This analysis does not depend at all, either explicitly or implicitly, on Dr. Jenkins's history expertise.  To the extent Dr. Jenkins's analysis of this evidence elsewhere draws some connection between the factual record and his expertise, *see, e.g.*, *id.* at 13 (asserting that 1960s-era literature would not have referred to Fitzgerald's act of tearing "the lower half of the swimsuit of a girl aged eight to ten" as "assault, abuse, or molestation"), these connections are too few and too far removed from the issue to be tried to justify their admission.

*The Does' Motion No. 1 – ECF No. 206*

The Does seek to exclude evidence of two prior alleged acts committed by Fitzgerald—the 1963 Henry, Illinois incident and the 1966 or 1967 Sisseton, South Dakota incident.  ECF No. 206 at 1–2.  These acts were described in the order addressing TIG's summary-judgment motions.  *Missionary Oblates of Mary Immaculate*, 2023 WL 7001760, at *2–3.  The Does argue that these prior incidents did not result in "bodily injury" as Minnesota insurance law defines that term and are therefore not similar to the bodily-injury-causing abuse they suffered.  ECF No. 206 at 3–4.  This motion will be denied.  It is true that Minnesota law interprets "bodily injury," when used in an insurance policy, to require physical injury and not to include nonphysical harm.  *See Missionary Oblates of Mary Immaculate*, 2023 WL 7001760, at *10–14.  But sexual abuse incidents that do not cause physical injury are nonetheless relevant to showing whether future sexual abuse—injury-causing or not—is substantially probable.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      TIG's Motion in Limine No. 1 to Preclude Introduction into Evidence of the Integrity Policy [ECF No. 192] is **DENIED**.

2.      TIG's Motion in Limine No. 2 to Preclude Introduction into Evidence of Corporate Representative, Non-Personal Knowledge Testimony Regarding Oblates' Cash Disbursements Journal [ECF No. 193] is **DENIED** to the extent it seeks exclusion of Huff and Whitley's authentication-directed testimony and **GRANTED** to the extent it seeks exclusion of their testimony regarding the journal's meaning and significance.

3.      TIG's Motion in Limine No. 3 to Preclude Introduction into Evidence of Cash Disbursements Journal [ECF No. 195] is **DENIED**.

4.      TIG's Motion in Limine No. 4 to Exclude Opinions and Testimony of Jeffrey E. Thomas [ECF No. 196] is **DENIED**.

5.      TIG's Motion in Limine No. 5 to Preclude Testimony at Trial by Intervenors and Doe 155 [ECF No. 197] is **DENIED** to the extent the Does' testimony concerns the circumstances of their abuse and necessary introductory testimony and **GRANTED** in all other respects.

6.      TIG's Motion in Limine No. 6 to Exclude Opinions and Testimony of Professor Philip Jenkins [ECF No. 198] is **GRANTED**.

7.      Intervenors' Motion in Limine to Exclude Evidence of the 1960s Incidents

[ECF No. 206] is **DENIED**.

Dated: February 20, 2024                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court